**E-FILED**
Monday, 24 September, 2007  09:33:34 AM
Clerk, U.S. District Court, ILCD

# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD DIVISION

A.G. EDWARDS & SONS, INC.,    )
a Delaware Corporation,    )
    )
    Plaintiff,    )
    )
    )    Case No.  $07\text{-}3260$
    v.    )
    )
RICHARD MARCOLLA, DANIEL BARRY,    )
THOMAS CUTRONE, KRISTA SAVAGE,    )
JOYCE GLANZMAN, KAREN LOESCHEN,    )
WILLIAM (RAMSAY) EASTERLING    )
and GENE HARSHMAN, individuals,    )
    )
    Defendants.    )
    )

**FILED**

SEP 2 4 2007

JOHN M. WATERS, Clerk
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

## COMPLAINT
## (INJUNCTIVE RELIEF SOUGHT)

Plaintiff A.G. Edwards & Sons, Inc. ("Edwards"), by its undersigned attorneys, alleges:

### Preliminary Statement

1.    This action is for a temporary restraining order and a preliminary injunction to maintain the status quo pending resolution of an arbitration proceeding between the parties and their new employer, Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch") that concurrently is being filed with FINRA Dispute Resolution.[1]

---

[1]    The Financial Industry Regulatory Authority ("FINRA") was created in July 2007 through the consolidation of the National Association of Securities Dealers, Inc. (the "NASD") and the member regulation, enforcement and arbitration functions of the New York Stock Exchange. Edwards has the express right to seek temporary injunctive relief before a court of competent jurisdiction pending the outcome of arbitration before a full panel of duly-appointed arbitrators pursuant to Rule 13804 of the NASD Code of Arbitration Procedure for Industry Disputes. A true and correct copy of Rule 13804 is annexed as Exhibit A to the accompanying affidavit of Charles Galli, sworn to September 22, 2007 (the "Galli Affidavit").

2.      The immediate action and concurrent arbitration arise out of the following facts. Richard Marcolla ("Marcolla") was Edwards' branch office manager in its Quincy, Illinois office until his recent and abrupt resignation on September 21, 2007, after which he immediately commenced employment with Merrill Lynch, a direct competitor of Edwards.    The other defendants, Daniel Barry ("Barry"), Thomas Cutrone ("Cutrone"), Krista Savage ("Savage"), Joyce Glanzman ("Glanzman"), William (Ramsay) Easterling ("Easterling"), and Gene Harshman ("Harshman") were Edwards financial consultants and defendant Karen Loeschen ("Loeschen") (collectively, "Defendants") was a registered financial associate in Edwards' Quincy office until their recent and abrupt mass resignation on September 21, 2007, after which they immediately commenced employment with Merrill Lynch.   In addition, Joyce Hoover-Clelland (wire operator), Valarie Wiewel (cashier) and Deana Smith (non-registered financial associate) in the Quincy office also terminated their employment with Edwards on September 21, 2007 and immediately joined the Defendants at Merrill Lynch.  On the same date as Defendants' mass resignation, Merrill Lynch opened an office in Quincy in the very same building as Edwards' Quincy office.  Prior to opening this office, Merrill Lynch had no presence in Quincy or the surrounding area.  The resignation of these employees has destroyed Edwards' Quincy office and left it without any financial consultants or staff whatsoever.

3.      Defendants' have breached their contracts and their common law obligations to Edwards.  In particular, Marcolla has improperly solicited Edwards' personnel to join him at his new employer, Merrill Lynch. This solicitation has occurred in clear violation of Marcolla's common-law obligations and fiduciary duties to Edwards.  The solicitation also represents unfair competition and misappropriation of trade secrets, and the other Defendants have breached their contracts and their common law obligations to Edwards.

2

4.      Defendants conduct is also in violation of the Protocol for Broker Recruiting (the "Protocol"), which regulates the conduct and the type of information registered representatives may take with them when they move from one Protocol-signatory firm to another.  A true and correct copy of the Protocol is attached to the accompanying Affidavit of David Saunders, sworn to on September 22, 2007.  Pursuant to the Protocol, when a registered representative leaves one Protocol-signatory firm for another, the registered representative is permitted to "take only the following account information: client name, address, phone number, email address and account title of the clients that they serviced while at the firm ("the Client Information") and are prohibited from taking any other documents or information."  In addition, the Protocol states that registered representatives who comply with the Protocol are permitted to solicit "customers that they serviced while at their former firms, **but only after they have joined their new firms**." (emphasis added).  Defendants have wantonly violated these provisions of the protocol by misappropriating Edwards' trade secrets and confidential information, and by improperly soliciting Edwards customers and personnel.    Accordingly, the Protocol is inapplicable to this matter.

5.      By its terms, the Protocol is also inapplicable to this matter because this action involves "raiding."

6.      To prevent continued irreparable harm arising from this course of misconduct, Edwards seeks immediate injunctive relief (in the form of a temporary restraining order and a preliminary injunction) barring the Defendants from soliciting Edwards' personnel and barring Defendants from using Edwards' confidential and proprietary business and customer information, pending resolution of Edwards' claims against Defendants in the parallel arbitration.

**Jurisdiction and Venue**

7.      The Court has jurisdiction in this action pursuant to 28 U.S.C. §1332(a) in that, as alleged below, plaintiff Edwards, on the one hand, and defendants Marcolla, Barry, Cutrone, Savage, Glanzman, Loeschen, Easterling and Harshman, on the other hand, are citizens of different states, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

8.      Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(a), in that a substantial part of the events giving rise to the claims occurred in Adams County, Illinois.

**The Parties**

9.      Plaintiff Edwards is a corporation organized under the laws of the state of Delaware with its principal place of business located in St. Louis, Missouri. Edwards is a securities broker-dealer and is a member of FINRA, the New York Stock Exchange, Inc. and all other major exchanges. Edwards maintains a branch office in Quincy, Illinois.

10.     Defendant Marcolla is an individual who at all times relevant herein was employed and/or conducted business in Adams County, Illinois and was and is a citizen of Illinois. Marcolla also is a registered representative currently employed by Merrill Lynch. He was previously employed by Edwards as the branch manager of its Quincy, Illinois branch office.

11.     Defendant Barry is an individual who at all times relevant herein was employed and/or conducted business in Adams County, Illinois and was and is a citizen of Illinois. Barry also is a registered representative currently employed by Merrill Lynch. He was previously employed by Edwards as a financial consultant in its Quincy, Illinois branch office.

4

12.     Defendant Cutrone is an individual who at all times relevant herein was employed and/or conducted business in Adams County, Illinois and was and is a citizen of Illinois. Cutrone also is a registered representative currently employed by Merrill Lynch. He was previously employed by Edwards as a financial consultant in its Quincy, Illinois branch office.

13.     Defendant Savage is an individual who at all times relevant herein was employed and/or conducted business in Adams County, Illinois and was and is a citizen of Illinois. Savage also is a registered representative currently employed by Merrill Lynch. She was previously employed by Edwards as a financial consultant in its Quincy, Illinois branch office.

14.     Defendant Glanzman is an individual who at all times relevant herein was employed and/or conducted business in Adams County, Illinois and was and is a citizen of Illinois. Glanzman also is a registered representative currently employed by Merrill Lynch. She was previously employed by Edwards as a financial consultant in its Quincy, Illinois branch office.

15.     Defendant Loeschen is an individual who at all times relevant herein was employed and/or conducted business in Adams County, Illinois and was and is a citizen of Illinois. Loeschen also is a registered financial associate currently employed by Merrill Lynch. She was previously employed by Edwards as a financial associate in its Quincy, Illinois branch office.

16.     Defendant Easterling is an individual who at all times relevant herein was employed and/or conducted business in Adams County, Illinois and was and is a citizen of Illinois. Easterling also is a registered representative currently employed by Merrill Lynch. He

was previously employed by Edwards as a financial consultant in its Quincy, Illinois branch office.

17.  Defendant Harshman is an individual who at all times relevant herein was employed and/or conducted business in Adams County, Illinois and was and is a citizen of Illinois. Harshman also is a registered representative currently employed by Merrill Lynch. He was previously employed by Edwards as a financial consultant in its Quincy, Illinois branch office.

18.  In connection with their status as Registered Representatives of Edwards, the Defendants executed a Form U-4 Uniform Application for Securities Industry Registration or Transfer. By executing the Form U-4, the Defendants agreed to submit to arbitration disputes, claims and controversies arising between themselves and Edwards.

**Factual Allegations**

19.  Edwards is a national broker-dealer, serving individual and institutional clients throughout the country. Edwards provides brokerage services in the Quincy area through its Quincy office.

20.  On May 31, 2007, Wachovia Corporation ("Wachovia") and Edwards publicly announced that they had agreed to a transaction whereby Edwards would be merged with a wholly-owned subsidiary of Wachovia (the "Merger"). Upon information and belief, Merrill Lynch has been recruiting Edwards employees, including Defendants, to interfere with the Merger.

21.  Marcolla was employed by Edwards beginning in or about March 13, 1995. On September 21, 2007, when he abruptly resigned without prior notice, Marcolla was the Branch Office Manager of Edwards' Quincy office.

22.     As Branch Office Manger, Marcolla had direct or indirect supervisory responsibility for six other brokers, who are referred to as "financial consultants" -- the other Defendants in this action.  In his capacity as the highest ranking individual working in Edwards' Quincy office, Marcolla was responsible for, among other things, establishing performance objectives for the office, and for maximizing sales production to accomplish these objectives, with his own compensation tied to such performance.   Marcolla also was responsible for recruiting, hiring, training, developing, and supervising the Edwards financial consultants in the office, and responsible for the management of the branch including its files, client accounts and security.   Marcolla's responsibilities as a branch office manager were not solely of a management nature; Marcolla was also a producing broker responsible for Edwards' customer accounts.  At all times during his employment with Edwards, Edwards compensated Marcolla richly and provided him with numerous employment-related benefits and opportunities.

23.     As part of his official duties at Edwards, Marcolla had access to extensive confidential personnel information about all Edwards' financial consultants in the Quincy office. Such information -- which is not publicly available -- is proprietary and valuable, and would be especially useful to a competitor such as Merrill Lynch.   The information consisted of compensation details, performance reviews, highly sensitive client information and the like.

24.     On or about March 13, 1995, Marcolla entered into an Investment Broker Agreement (the "Marcolla Investment Broker Agreement") with Edwards.  A true and correct copy of the Marcolla Investment Broker Agreement is attached to the Galli Affidavit as Exhibit B.

25.     The Marcolla Investment Broker Agreement provides in Paragraph 15:

*You will devote your efforts solely to the business of Edwards and Edwards' subsidiary or affiliated companies and agencies.*

7

26.    The Marcolla Investment Broker Agreement also requires Marcolla in Paragraph 23 to return all client information to Edwards at the end of his employment:

> *In the event that your employment with Edwards ends at any time either through termination by Edwards or through resignation by you, you will surrender all training materials, account records, customers' statements and customers' files to Edwards . . . .*

27.    On or about March 13, 1995, Marcolla also entered into a Supplementary Training Agreement for an Investment Broker (the "Marcolla Supplementary Investment Broker Agreement") with Edwards.  A true and correct copy of the Marcolla Supplementary Investment Broker Agreement is attached to the Galli Affidavit as Exhibit C.

28.    The Marcolla Supplementary Investment Broker Agreement provides in Paragraph 5:

> *During the term of your employment by Edwards and for one hundred and eighty (180) days following termination of your employment, you will not recruit, entice, induce or solicit, directly or indirectly, any employee of Edwards or any of its affiliates for employment with any other organization which does business in securities, commodities and financial futures, insurance or any other lines of business in which Edwards or any of its affiliates is engaged.*

29.    On or about January 29, 1985, Barry entered into an Investment Broker Agreement (the "Barry Investment Broker Agreement") with Edwards.  A true and correct copy of the Investment Broker Agreement is attached to the Galli Affidavit as Exhibit D.

30.    On or about February 20, 1985, Harshman entered into an Investment Broker Agreement (the "Harshman Investment Broker Agreement") with Edwards.  A true and correct copy of the Investment Broker Agreement is attached to the Galli Affidavit as Exhibit E.

31.    The Barry and Harshman Investment Broker Agreements provide in Paragraph 1:

> *So long as you serve as an employee of Edwards, you will act only in Edwards' best interest. For that purpose, you will perform your work competently and diligently; and you will observe all directions given by officials of Edwards, all policies announced by Edwards, all regulations and procedures prescribed in Edwards' Policy and Procedures Manuals and Compliance Manuals as from time to time are altered or issued, and all applicable rules of regulatory authorities. You will conduct yourself as a loyal and faithful employee of Edwards, and you will in no event take any action which could harm Edwards' business or its relationships with its clients*

32.     The Barry and Harshman Investment Broker Agreements further provide in Paragraph 19:

> *Both during and after the time you serve as an employee of Edwards, you will not divulge to any person any information received during the course of your employment concerning the business of the firm and its financial affairs.*

33.     The Barry and Harshman Broker Agreements also require Barry and Harshman in Paragraph 23 to return all client information to Edwards at the end of their employment:

> *In the event that your employment with Edwards ends at any time either through termination by Edwards or through resignation by you, you will surrender all training materials, account records, customer' statements and customers' files to Edwards . . . .*

34.     On or about February 14, 2005, Easterling entered into a Financial Consultant Agreement Financial Consultant Agreement (the "Easterling Financial Consultant Agreement") with Edwards.   A true and correct copy of the Easterling Financial Consultant Agreement is attached to the Galli Affidavit as <u>Exhibit F</u>.

35.     The Easterling Financial Consultant Agreement provides in Paragraph 1:

> *So long as you serve as an employee of Edwards, you will act only in Edwards' best interest. For that purpose, you will perform your work competently and diligently; and you will observe all directions given by officials of Edwards, all policies announced by Edwards, all regulations and procedures prescribed in Edwards' Policy and Procedures Manuals*

*and other manuals as from time to time are altered or issued, and all applicable rules of regulatory authorities. . . . You will conduct yourself as a loyal and faithful employee of Edwards, and you will in no event take any action that could harm Edwards' business or its relationships with its customers/clients.*

36.    The Easterling Financial Consultant Agreement (in Paragraph 25) identifies Edwards' customer information as the sole exclusive property of Edwards, confirms that such information is a trade secret, and requires the financial consultants to treat the information properly.   The contracts also require the financial consultants to return all such information to Edwards upon termination of their association with the company.   Specifically, Paragraph 25 of the Financial Consultant Agreement provides as follows:

*You will not use or remove any documents or records from the Edwards office except for the sole purpose of conducting business on behalf of Edwards.   You agree not to divulge or disclose these records or documents to any third party and, under no circumstances, will you reveal or permit these records or documents to become known to any individual or organization that does business in securities, commodities and financial futures, insurance or any other lines of business in which Edwards or any of its affiliates are engaged.*

*This information is not generally known outside Edwards, and this information is kept confidential within Edwards.   This information was acquired by a great expenditure of time, effort and money, is unique and cannot be lawfully duplicated or easily acquired.   You agree that these records and documents are the property of Edwards and deserve trade secret protection.*

37.    The Easterling Financial Consultant Agreement also contains a restrictive covenant in Paragraph 29, which prohibits the solicitation of Edwards' employees:

*You will not recruit, entice, induce or solicit, directly or indirectly, during your employment with Edwards or for a period of one year following your termination of employment by Edwards, any employee of Edwards or any of its affiliates for employment with any other organization that does business in securities, commodities and financial futures, insurance or any other lines of business in which Edwards or any of its affiliates is engaged.*

38.    The Easterling Financial Consultant Agreement further provides in Paragraph 33 that he consents "to the issuance of a temporary restraining order or a preliminary or permanent injunction" ordering him to immediately return all Edwards documents, enjoining the use of such documents.

39.    On or about July 4, 1990 and August 24, 1990, Cutrone entered into an Investment Broker Agreement (the "Cutrone Investment Broker Agreement") with Edwards. A true and correct copy of the Cutrone Investment Broker Agreement is attached to the Galli Affidavit as Exhibit G.

40.    On or about August 3, 1993, Glanzman entered into an Investment Broker Agreement (the "Glanzman Investment Broker Agreement") with Edwards.  A true and correct copy of the Glanzman Investment Broker Agreement is attached to the Galli Affidavit as Exhibit H.

41.    The Cutrone and Glanzman Investment Broker Agreements provide in Paragraph 21:

> *So long as you serve as an employee of Edwards, you will act only in Edwards' best interest. For that purpose, you will perform your work competently and diligently; and you will observe all directions given by officials of Edwards, all policies announced by Edwards, all regulations and procedures prescribed in Edwards' Policy and Procedures Manuals and other manuals as from time to time are altered or issued, and all applicable rules of regulatory authorities. . . . You will conduct yourself as a loyal and faithful employee of Edwards, and you will in no event take any action that could harm Edwards' business or its relationships with its customers/clients.*

42.    The Cutrone and Glanzman Investment Broker Agreements require Cutrone and Glanzman in Paragraph 23 to return all client information to Edwards at the end of their employment:

> *In the event that your employment with Edwards ends at any time either through termination by Edwards or through resignation by you, you will surrender all training materials, account records, customers' statements and customers' files to Edwards . . . .*

43.     On or about August 3, 1993, Glanzman also entered into a Supplementary Training Agreement for an Investment Broker (the "Glanzman Supplementary Investment Broker Agreement") with Edwards.  A true and correct copy of the Glanzman Supplementary Investment Broker Agreement is attached to the Galli Affidavit as <u>Exhibit I</u>.

44.     The Glanzman Supplementary Investment Broker Agreement provides in Paragraph 4:

> *During the term of your employment by Edwards and for one hundred and eighty (180) days following termination of your employment, you will not recruit, entice, induce or solicit, directly or indirectly, any employee of Edwards or any of its affiliates for employment with any other organization which does business in securities, commodities and financial futures, insurance or any other lines of business in which Edwards or any of its affiliates is engaged.*

45.     On or about August 24, 1990, Cutrone also entered into a Supplementary Training Agreement for an Investment Broker (the "Cutrone Supplementary Investment Broker Agreement") with Edwards.  A true and correct copy of the Cutrone Supplementary Investment Broker Agreement is attached to the Galli Affidavit as <u>Exhibit J</u>.

46.     On or about May 28, 1998, Loeschen entered into an Investment Sales Assistant Agreement (the "Loeschen Sales Assistant Agreement") with Edwards.  A true and correct copy of the Investment Broker Agreement is attached to the Galli Affidavit as <u>Exhibit K</u>.

47.     The Loeschen Sales Assistant Agreement provides in Paragraph 1:

> *So long as you serve as an employee of Edwards, you will act only in Edwards' best interest. For that purpose, you will perform your work competently and diligently; and you will observe all directions given by officials of Edwards, all policies announced by Edwards, all regulations and procedures prescribed in Edwards' Policy and Procedures Manuals*

> *and Compliance Manuals as from time to time are altered or issued, and all applicable rules of regulatory authorities. You will conduct yourself as a loyal and faithful employee of Edwards, and you will in no event take any action which could harm Edwards' business or its relationships with its clients.*

48.    The Loeschen Sales Assistant Agreement also restricts the use of Edwards' confidential information in Paragraph 2:

> *All records and documents concerning the business and affairs of Edwards including without limitation the names, addresses, telephone numbers and assets and obligations carried in the accounts of its customers . . . are, and shall always be, the confidential and exclusive property of Edwards. Your use of such records and documents, . . . shall cease immediately upon the first of the following events to occur: You (1) resignation, (2) retirement, (3) release, (4) discharge, (5) acceptance of other employment, or (6) termination of employment for any other reason.*
>
> *You (A) shall not remove any such records or documents from the premises of Edwards in either original, duplicate or copied form, except in the ordinary course of conducting business for, and subject to approval by, Edwards and (B) shall immediately deliver to Edwards, prior to the termination of employment, or at any other time upon Edwards' request, any such records and documents in the employee's possession or control.*
>
> *You shall not (A) disclose to any person, firm, association, partnership, corporation or other entity, the contents, in whole or in part, of such records and documents, except in the ordinary course of conducting business for Edwards: (B) directly or indirectly solicit or aid in the solicitation on behalf of any other organization, any customers having accounts with Edwards with whom you shall have had any dealings whatsoever during your employment with Edwards . . . and/or (C) recruit, entice, induce or solicit, directly or indirectly, any employee of Edwards or any of its affiliates for employment with any other organization which does business in securities, commodities and financial futures, insurance or any other lines of business in which Edwards or any of its affiliates is engaged.*
>
> *In the event you breach any of the covenants contained in this paragraph, you acknowledge that Edwards' remedies at law for damages will be inadequate and that Edwards shall be entitled to injunctive relief to prevent your prospective or continuing breach of these provisions.*

*This provision shall not be construed in any way to constitute a waiver by Edwards of any available remedy at law.*

49.    The Loeschen Sales Assistant Agreement also requires Loeschen in

Paragraph 26 to return all client information to Edwards at the end of her employment:

*In the event that your employment with Edwards ends at any time either through termination by Edwards or through resignation by you, you will surrender all training materials, account records, customers' statements and customers' files to Edwards . . . .*

50.    On or about July 20, 1999, Savage entered into a Financial Consultant

Agreement (the "Savage Financial Consultant Agreement") with Edwards.  A true and correct

copy of the Financial Consultant Agreement is attached to the Galli Affidavit as <u>Exhibit L</u>.

51.    The Savage Financial Consultant Agreement provides in Paragraph 1:

*So long as you serve as an employee of Edwards, you will act only in Edwards' best interest. For that purpose, you will perform your work competently and diligently; and you will observe all directions given by officials of Edwards, all policies announced by Edwards, all regulations and procedures prescribed in Edwards' Policy and Procedures Manuals and other manuals as from time to time are altered or issued, and all applicable rules of regulatory authorities. . . . You will conduct yourself as a loyal and faithful employee of Edwards, and you will in no event take any action that could harm Edwards' business or its relationships with its customers/clients.*

52.    The Savage Financial Consultant Agreement also requires Savage in

Paragraph 26 to return all client information to Edwards at the end of her employment:

*In the event that your employment with Edwards ends at any time either through termination by Edwards or through resignation by you, you will surrender all training materials, account records, customers' statements and customers' files to Edwards . . . .*

53.    On or about July 20, 1999, Savage also entered into a Supplementary

Training Agreement for Financial Consultant (the "Savage Supplementary Financial Consultant

Agreement") with Edwards.  A true and correct copy of the Savage Supplementary Financial

Consultant Agreement is attached to the Galli Affidavit as <u>Exhibit M</u>.

      54.    On or about January 6, 2004, Marcolla entered into a Financial Consultant

Client Book Agreement (the "Financial Consultant Client Book Agreement") with Wayne Lock,

a retiring financial consultant of Edwards, to purchase a portion of his book of business.  A true

and correct copy of the Marcolla Financial Consultant Client Book Agreement is attached to the

Galli Affidavit as <u>Exhibit N</u>.

      55.    The Marcolla Financial Consultant Client Book Agreement provides in

Paragraph 11:

> *I recognize and acknowledge that Edwards has a substantial interest in retaining the accounts and the Reassigned Clients; therefore, I agree that I will not for a period of five years from the date of termination of employment:*
>
> *(A) Remove or cause to be removed, directly or indirectly, any records of Edwards . . .*
>
> *(B) Transmit verbally, electronically or otherwise the names, addresses and/or other facts concerning the Reassigned Clients, to any other person or party for any reason whatsoever.*
>
> *(C) Directly or indirectly solicit, or aid in the solicitation on behalf of any other organization, the Reassigned Clients . . .*
>
> *(D) Recruit, entice or solicit directly or indirectly, any employee of Edwards or any of its affiliates for employment with any other organization that does business in securities, . . .*
>
> *In the event I breach any of the covenants contained in (a), (b), (c) and/or (d) above, I agree that Edwards is entitled to injunctive relief, I recognize that Edwards will suffer immediate and irreparable harm and that money damages will not be adequate to compensate Edwards or to protect and preserve the status quo.*
>
> *Therefore, I consent to the issuance of a temporary restraining order or a preliminary injunction or permanent injunction ordering:*

(i)     *That I immediately return to Edwards all records whether original, duplicated, computerized, handwritten, or in any other form whatsoever, and that I be enjoined and restrained from using or disclosing any information contained in such records.*

(ii)    *That for a period of one year I be enjoined and restrained from soliciting Reassigned Client.*

(iii)   *That I be further enjoined and restrained for a period of one year from accepting business from any Reassigned Client who was solicited in violation of this agreement or whose records and information was used in violation of this agreement.*

(iv)    *That I be enjoined and restrained from recruiting, enticing, inducing or soliciting, directly or indirectly, any employee of Edwards or any of its affiliates to accept employment with any other organization which does business in securities, commodities and financial futures, insurance or other lines of business in which Edwards or any of its affiliates is engaged.*

56.     Similarly, on or about January 6, 2004, Glanzman and Cutrone each entered into a Financial Consultant Client Book Agreement (the "Glanzman Financial Consultant Client Book Agreement" and the "Cutrone Financial Consultant Client Book Agreement") with Wayne Lock, a retiring financial consultant of Edwards, to purchase a portion of his book of business. A true and correct copy of the Glanzman Financial Consultant Client Book Agreement and the Cutrone Financial Consultant Client Book Agreement are attached to the Galli Affidavit as Exhibit O and P. The Glanzman and Cutrone Financial Consultant Client Book Agreements contain the same covenants in Paragraph 11 as those set forth above in the Marcolla Financial Consultant Client Book Agreement.

57.     Each of the Defendants also were bound by Edwards' confidentiality policy as set forth in Section 9.2 of Edwards' Sales Practice Manual, which was made available to all of Edwards' employees:

> *Confidentiality of Client Account Information*
> *Client account confidentiality is a very serious matter that all employees*
> *should observe at all times. You should never discuss information*
> *regarding a client's transactions or account status with other employees,*
> *persons not authorized to transact business in the account (spouse,*
> *parent or child), or government or regulatory authorities.*

A true and correct copy of Section 9.2 of Edwards' Sales Practice Manual is attached to the Galli

Affidavit as <u>Exhibit Q</u>.

      58.    Additionally, all Edwards employees, including Defendants, were

provided with Edwards' Code of Ethical Conduct, dated September 8, 2004, which provides, in

relevant part:

> **CONFIDENTIALITY**
>
> *Directors, officers and employees are obligated to maintain the*
> *confidentiality of information entrusted to them by A.G. Edwards, its*
> *vendors and/or other employees. Directors, officers and employees must*
> *further abide by A.G. Edwards' Privacy Policy as it pertains to the*
> *handling of nonpublic, client information and must maintain the*
> *confidentiality of information concerning other employees that they*
> *receive in performing their jobs. Exceptions to the nondisclosure of such*
> *information must be authorized by A.G. Edwards' management or*
> *mandated by legal or regulatory entities.*
> *No A.G. Edwards representative may provide nonpublic information to*
> *persons or organizations outside A.G. Edwards, including the media,*
> *unless authorized to do so.*
>          *            \*            \**
> *These restrictions regarding confidentiality apply to confidential*
> *information received by employees or officers prior to their termination*
> *with A.G. Edwards and continue after their employment with A.G.*
> *Edwards ends.*

      59.    As set forth on page one of Edwards' Code of Ethical Conduct, all

Edwards employees are required to read it and certify (in electronic form) that they fully

understand it. On information and belief, Defendants did so certify while they were Edwards'

employees. A copy of Edwards' Code of Ethical Conduct is attached to the Galli Affidavit as

<u>Exhibit R</u>.

60.     In consideration for Defendants entering into an employment relationship with Edwards and executing their respective agreements, Defendants were provided with significant benefits, including substantial compensation, office and support facilities, fully-paid health insurance, securities registration, insurance licensing, underwriting, research, brokerage operations, and participation in the company 401K plan.

61.     On September 21, 2007, Defendants after -- on information and belief -- plotting and secretly scheming in a raid orchestrated by Marcolla -- resigned from Edwards. They immediately commenced employment with Merrill Lynch, one of Edwards' major competitors, who opened an office in the very same building as the Quincy office on the same date as Defendants' resignation.  Prior to opening this office, Merrill Lynch had no presence in Quincy or the surrounding area.

62.     Edwards is informed and believes that Marcolla actively solicited the other Defendants while they were all still employed at Edwards to move to Merrill Lynch.

63.     In the short time subsequent to their resignation, Defendants have repeatedly breached the restrictive covenants set forth in their agreements with Edwards and their common-law obligations.

64.     At the time of their resignations, Defendants were the largest producers in the Quincy office and generated on an annualized basis approximately $1.5 million in 2006 based on $451 million total assets under management and 5,100 of Edwards' customer accounts.

65.     Many of Edwards' clients who were serviced by Defendants were either inherited by Defendants from other Edwards financial consultants or were acquired through other Edwards assisted means, such as:  1) walk-in customers; 2) call-in customers; 3) customers from Edwards' advertising efforts; 4) customers from Edwards' mailing lists; 5) referral customers

from other Edwards accounts; 6) leads provided by Edwards; and 7) other sales advantages resulting from Edwards' goodwill, reputation and name recognition.

**Edwards' Confidential Information**

66.    During the course of their employment by Edwards, Defendants had access to highly confidential Edwards' customer files and other information that is confidential and proprietary to Edwards.   Edwards' customer records contain confidential financial information regarding each client, including client identity, social security numbers, address, telephone numbers, transactional history, tax information, personal financial data, insurance information, banking information and investment objectives, among other data.

67.    A critical factor to Edwards' continued success is its relations with its customers and financial consultants.  Edwards has built the loyalty of its customer base through many years of effort and has invested substantially in building Edwards' goodwill.  Edwards spends substantial resources in terms of time, effort and money annually to provide programs and support to its financial consultants, including the Defendants, for them to use to obtain and build relationships with its customers.

68.    Edwards' customer lists and other records are not available from other sources and have been created and updated for a period of years based on Edwards' relationship with its clients.  Edwards has invested substantial corporate resources to develop and maintain its customer information.  These resources include supplies, equipment, personnel and postage for direct mail solicitation, personnel and equipment for telephone solicitation, television advertising, print advertising and other miscellaneous marketing activities.

69.    Edwards has also expended significant resources to service the customers that were assigned to Defendants.   These resources include execution costs for securities

transactions, costs for staff and equipment to perform securities research and analysis, and other services.  Edwards has borne the entire expense of these services and activities as well, with no financial contribution from the Defendants whatsoever.

70.    The trade secret information that Defendants have misappropriated was entrusted to Edwards by its customers with the expectation that it would remain confidential and would not be disclosed to third parties.  Defendants had access to this information solely by virtue of their employment by Edwards.  Edwards, and the Defendants, are obliged to maintain the confidentiality of this information.  For its part, Edwards took numerous steps to protect the confidentiality of this information.  The Defendants were fully aware of, and responsible for, complying with Edwards' internal policies regarding confidentiality.  Moreover, every year Edwards conducts an annual compliance interview to ensure, among other things, that the confidentiality of Edwards' records is maintained.  As a condition of their employment with Edwards, the Defendants -- like all other Edwards registered representatives -- acknowledged that they were familiar with Edwards' internal policies regarding confidentiality of customer records.  Edwards has implemented numerous other policies to ensure the confidentiality of its customer information.  For example, access to the Edwards' secure computer network by registered representatives is password-protected.

71.    Employees such as the Defendants are instructed to maintain customer information as strictly confidential.  These instructions are confirmed in the various agreements and policy manual provisions referenced above and, until Defendants' mass resignation, these policies were strictly observed.

**The Defendants' Misconduct**

72.     On or about September 21, 2007, Defendants resigned from Edwards without notice and immediately commenced employment with Merrill Lynch, a direct competitor of Edwards, who opened an office in the very same building as Edwards' Quincy office on the same date as Defendants' resignation.   Prior to opening this office, Merrill Lynch had no presence in Quincy or the surrounding area.

73.     In exchange for substantial financial inducements in guaranteed loans and other incentives that were promised to them by Merrill Lynch, Defendants have begun the solicitation of Edwards' customers in violation of their obligations to Edwards.   Specifically, Defendants embarked upon a telephone campaign to notify Edwards customers of their move to Merrill Lynch and to solicit Edwards customers to transfer their accounts from Edwards to Merrill Lynch.   On information and belief, Defendants told clients while still employed by Edwards that they were planning to leave Edwards and would be joining Merrill Lynch.

74.     Defendants have also deprived Edwards of the keys to its Quincy office. Despite numerous attempts by Edwards to obtain the keys from Defendants, on information and belief, to date, Defendants have failed to return the keys to Edwards' Quincy office, and Edwards was forced to hire a locksmith to gain access to its Quincy office.

75.     On information and belief, before leaving Edwards, Defendants misappropriated Edwards' confidential customer information.   These documents contain the names, addresses, social security numbers, telephone numbers and specific financial information pertaining to the Edwards clients that Defendants serviced.   This information is protected information.  On information and belief, prior to their resignation, Defendants printed out client reports from both Edwards' BrokerVision and Account Inquiry system for every one of the

hundreds of clients serviced by Defendants. These reports would contain all of the information relating to the Edwards client, including account number, account holdings, activity and personal information, such as the client's social security number. All of this information is well beyond the "Client Information" that a broker is permitted to retain under the Protocol.

76.     On information and belief, Defendants, with the assistance of Merrill Lynch, prepared a mass solicitation mailing to most, if not all, of Edwards' clients whom they serviced to be sent immediately after their resignation. On information and belief, this could never have occurred unless Defendants gave Edwards' client information to Merrill Lynch while the Defendants were still employed by Edwards.

77.     Most of the Edwards customers that Defendants serviced over the years were developed by Edwards at great expense and over a number of years. Edwards' customer list is a lifeblood of its business and the expenditures incurred by Edwards in obtaining its clients include the many thousands of dollars spent by Edwards every year on national and local advertising, the millions of dollars it costs to train the Edwards sales force, and the millions of dollars a year Edwards spends for sales support staff, clearing services, operations personnel, systems and support, management and compliance supervision, salaries, annual registration fees, computer services and equipment, phone, mail, research, literature, seminars, trade and other professional news publications, promotional events, the retention of experts, and the many other expenditures Edwards incurs in maintaining its goodwill in the securities industry.

78.     Unless Defendants' misconduct is immediately restrained and enjoined, other competitors of Edwards will be encouraged to engage in the same kind of illegal behavior, which will cause Edwards severe and permanent damage.

79. By seeking to pirate away Edwards' employees and, ultimately, its clients, Defendants have caused and will continue to cause continuing and irreparable injury to Edwards. Defendants' wrongdoing has caused and will continue to cause irreparable harm to Edwards by causing:

(a) Loss of personnel and damage to office stability;

(b) Present economic loss, which is unascertainable at this time, and future economic loss, which is now incalculable;

(c) Disclosure of trade secrets, customer and employee lists, and other proprietary and confidential business and customer information; and

(d) Loss of clients' and employees' confidence and trust, loss of goodwill, and loss of business reputation.

80. Money damages are insufficient to compensate Edwards for the harm caused by Defendants. At this time, it is not possible to quantify the present and future economic losses that Edwards is suffering and will continue to suffer due to the misappropriation of its trade secrets and confidential information, loss of clients, talented agents and employees to a competitor -- all due directly to the wrongdoing of Defendants as described herein. If Defendants' conduct continues unrestrained, the trust and confidence that clients have in Edwards will be permanently impaired.

### FIRST CLAIM FOR RELIEF
#### (Breach of Contract)

81. Edwards realleges and incorporates herein by reference the allegations of paragraphs 1 through 80 hereof.

82. Defendants breached their contracts with Edwards by soliciting Edwards' financial consultants to work at Merrill Lynch, and by soliciting Edwards' clients through the use of Edwards' confidential documents and information. By pirating away Edwards' employees,

and, ultimately, its clients and proprietary and confidential information, the Defendants seek to convert to their benefit Edwards' protectable interests.

83.     As a direct and proximate result of the Defendants' breach of their contracts, Edwards has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated.   Accordingly, Edwards is entitled to a temporary restraining order and a preliminary injunction.

## SECOND CLAIM FOR RELIEF
### (Misappropriation of Trade Secrets)

84.     Edwards realleges and incorporates herein by reference the allegations of paragraphs 1 through 83 hereof.

85.     Edwards' confidential and proprietary business and customer information derives substantial, independent economic value from not being generally known to the public or to Edwards' competitors, who could obtain economic value from the information.   Edwards expended substantial financial and human resources to develop this information, which cannot be easily acquired or replicated by others, from among the literally millions of actual or potential individual investors in the marketplace.   Further, Edwards has taken substantial efforts to maintain the secrecy of its confidential and proprietary business and customer information, including but not limited to restricting access to such information, designating such information as confidential, and requiring confidentiality agreements.   Accordingly, Edwards' confidential and proprietary business and customer information constitutes trade secrets pursuant to statutory and common law.

86.     As a direct and proximate result of the Defendants' misappropriation of Edwards' trade secrets, Edwards has sustained and will continue to sustain irreparable injury, the

damages from which cannot now be calculated. Accordingly, Edwards is entitled to a temporary restraining order and a preliminary injunction.

## THIRD CAUSE OF ACTION
### (Breach of Fiduciary Duty)

87.     Edwards realleges and reincorporates herein by reference the allegations contained in paragraphs 1 through 86 hereof.

88.     As a high-ranking member of Edwards management, Marcolla owed to Edwards a fiduciary duty of trust and loyalty.

89.     Marcolla's fiduciary duties required him at all times to, among other things, act in Edwards' best interests and maintain the confidentiality of Edwards' trade secrets and other confidential and proprietary business and customer information. Marcolla's fiduciary duties required him at all times to refrain from, among other things, soliciting Edwards' clients and Edwards' employees who worked for him to join Marcolla at a competing company, or suggesting that they do so and urging such employees to take Edwards customers, prospective customers and their confidential information with them to a competing company.

90.     Marcolla breached his fiduciary duties to Edwards by engaging in the conduct alleged above. Marcolla engaged in such wrongdoing prior to the time he resigned from Edwards and after he joined Edwards' direct competitor, Merrill Lynch.

91.     As a direct and proximate result of Marcolla's breach of fiduciary duty, Edwards has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated. Accordingly, Edwards is entitled to a temporary restraining order and a preliminary injunction.

## FOURTH CAUSE OF ACTION
### (Breach of Duty of Loyalty)

92.     Edwards realleges and incorporates herein by reference the allegations of paragraphs 1 through 91 hereof.

93.     By virtue or their positions with Edwards, Defendants owed Edwards a duty of undivided loyalty during the term of their employment with Edwards.  Defendants' duties of loyalty prohibited them from competing with Edwards or assisting a competing business during the course of their employment with Edwards.  Defendants' duties of loyalty also included a duty to act toward Edwards fairly, honestly and in good faith; to maintain the confidentiality of Edwards' trade secrets and other confidential and proprietary business and customer information; and to refrain from any act or omission calculated or likely to injure Edwards.

94.     Defendants breached their duties of loyalty to Edwards by engaging in the conduct alleged above (and incorporated herein) prior to the termination of their employment with Edwards.

95.     Defendants knew and intended, or knew and recklessly or negligently disregarded, that their acts had the purpose and/or effect of disrupting and harming Edwards' business.

96.     As a direct and proximate result of Defendants' breach of their duty of loyalty, Edwards has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated.  Accordingly, Edwards is entitled to a temporary restraining order and a preliminary injunction.

## FIFTH CAUSE OF ACTION
### (Inducing Breach of Contract)

97.    Edwards realleges and incorporates herein by reference the allegations of paragraphs 1 through 96 hereof.

98.    The financial consultants in Edwards' branch office are bound by employment agreements with Edwards, which obligate those employees, among other things: a) to devote their time, ability and effort to performance of their duties to Edwards; b) not to disclose or use Edwards' trade secrets or other confidential or proprietary business or customer information outside of the scope of their employment with Edwards, during or after their employment with Edwards; and/or c) not to use any of Edwards' confidential or proprietary information to call, solicit or take away any of Edwards' customers during or after the termination of their employment with Edwards.

99.    By virtue of his position with Edwards, Marcolla knew or should have known of the existence and terms of the employment agreements between Edwards and its employees.

100.    Defendants intentionally, maliciously and improperly interfered with Edwards' relationships and employment agreements with its employees by attempting to induce more than one of the financial consultants to leave their employment with Edwards and, upon information and belief, by attempting to induce them to breach their agreements with Edwards by, among other things, obtaining and using Edwards' trade secrets or other confidential or proprietary business or customer information, and by improperly soliciting Edwards' clients.

101.    There was no privilege or justification for Defendants' conduct.

102.    As a direct and proximate result of Defendants' conduct, Edwards has sustained and will continue to sustain damages, the exact amount of which is extremely difficult to calculate and is now unknown.

103.    Defendants' conduct as set forth and incorporated herein has been willful and malicious.

104.    As a direct and proximate result of the Defendants' tortious interference with contract, Edwards has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated.   Accordingly, Edwards is entitled to a temporary restraining order and a preliminary injunction.

### SIXTH CAUSE OF ACTION
**(Intentional Interference with Actual
and Prospective Economic Advantages)**

105.    Edwards realleges and incorporates herein by reference the allegations of paragraphs 1 through 104 hereof.

106.    Edwards has developed and maintains advantageous actual and prospective business relationships with its employees and clients that promise a continuing probability of future economic benefit to Edwards.

107.    Edwards is informed and believes, and on that basis alleges, that, because the Defendants occupied high-level and/or managerial positions with Edwards, they knew or reasonably should have known about Edwards' advantageous actual and prospective business relationships with its employees and clients.

108.    Edwards is informed and believes, and on that basis alleges, that Defendants have intentionally, maliciously and improperly interfered with and continue to interfere with Edwards' relationships with its employees and clients by, among other things,

directly and/or indirectly attempting to induce Edwards employees and clients to sever their relationships with Edwards and to induce them to do business with Merrill Lynch.

109.    There was no privilege and justification for Defendants' conduct. Moreover, the Defendants' actions also constitute wrongful conduct above and beyond the act of interference itself, including misappropriation of trade secrets, breach of contract, unfair competition, breach of the Defendants' fiduciary duty, and breach of their duty of loyalty.

110.    Defendants' conduct was willful and malicious.

111.    As a direct and proximate result of the Defendants' tortious interference with actual and prospective business relationships, Edwards has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated. Accordingly, Edwards is entitled to a temporary restraining order and a preliminary injunction.

**SEVENTH CAUSE OF ACTION**
**(Negligent Interference with Actual and**
**Prospective Economic Advantages)**

112.    Edwards realleges and incorporates herein by reference the allegations of paragraphs 1 through 111 hereof.

113.    Edwards entrusted Defendants with confidential information for use solely in performing their duties as an employee of Edwards. As officers and senior employees of Edwards, Defendants occupied positions of great trust and confidence. Defendants thereby owed Edwards a fiduciary duty to deal with Edwards in good faith and with loyalty. Defendants were also obligated to use due care so as not to interfere with Edwards' business relationships, including those with its employees and clients.

114.    Defendants, in breach of the Defendants' duty of due care, have attempted to induce Edwards employees and clients to leave Edwards.

115.    Edwards is informed and believes, and on that basis alleges, that the Defendants were fully aware that their failure to use ordinary care could subject Edwards to lose employees and thereby, lose clients.

116.    As a direct and proximate result of the Defendants' negligent interference with actual and prospective business relationships, Edwards has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated.  Accordingly, Edwards is entitled to a temporary restraining order and a preliminary injunction.

## EIGHTH CAUSE OF ACTION
### (Conversion)

117.    Edwards realleges and incorporates herein by reference, the allegations of paragraphs 1 through 116 hereof.

118.    At all times, Edwards was, and still is, entitled to the immediate and exclusive possession of its trade secrets and other proprietary information, and all physical embodiments thereof, as alleged above.

119.    Edwards is informed and believes that Defendants took Edwards' trade secrets and other proprietary information, including but not limited to records reflecting Edwards' employees' confidential employment data, as well as confidential client information, and converted them for the use of Defendants and those acting in concert with them.

120.    The continued detention of Edwards' personal property by the Defendants constitutes conversion.

121.    As a direct and proximate result of the Defendants' conversion, Edwards has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated.  Accordingly, Edwards is entitled to a temporary restraining order and a preliminary injunction.

30

## NINTH CAUSE OF ACTION
### (Raiding/Unfair Competition)

122.    Edwards realleges and incorporates herein by reference the allegations of paragraphs 1 through 121 hereof.

123.    Defendants' conduct as set forth above and incorporated herein is unlawful, unfair, fraudulent and deceptive, and constitutes unfair competition.

124.    As a direct and proximate result of Defendants' unfair competition, Edwards has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated.  Accordingly, Edwards is entitled to a temporary restraining order and a preliminary injunction.

WHEREFORE, Edwards respectfully requests that a judgment be entered in its favor against Defendants as follows:

A.    In support of all claims for relief, a temporary and preliminary  injunction lasting until such time as FINRA Dispute Resolution renders an award in the underlying dispute, enjoining and restraining the Defendants, directly or indirectly, and whether alone or in concert with others, including any director, officer, agent, employee and/or representative of Merrill Lynch, from:

> (1) soliciting or otherwise initiating any further contact or communication with any client of Edwards whom the Defendants served or whose name became known to the Defendants while in the employ of Edwards, including but limited to communicating with such clients for the purpose of advising them of the Defendants' new affiliation with Merrill Lynch or for the purpose of inviting, encouraging, or requesting the transfer of any accounts from Edwards;

> (2) (a) soliciting the employment of any Edwards' employee or broker, (b) hiring any Edwards employee or broker, (c) inducing any Edwards employee or broker to leave the employ of Edwards, and (d) taking any action to assist Merrill Lynch or any other entity employing Defendants

from soliciting, inducing or hiring any employee or broker to leave Edwards; and

(3) using, disclosing or transmitting for any purpose any confidential or proprietary information belonging to or concerning Edwards, its customers or employees, including but not limited to the (i) names, addresses, social security numbers, phone numbers, financial information, investment objectives and account information of Edwards' clients; (ii) the names, salaries, production and other business information regarding Edwards' brokers and employees; and (iii) other confidential information, trade secrets and commercially sensitive materials of Edwards.

B.     Ordering the Defendants, and all those acting in concert with them, including but limited to the directors, officers, employees and agents of Merrill Lynch, to return to Edwards all records, documents and/or information in whatever form (whether original, copied, computerized or handwritten), pertaining to Edwards' customers, employees and business, and purge all documents and information derived therefrom from the possession, custody and control of the Defendants and Merrill Lynch.

C.     Such other and further relief as the Court deems just and proper.

Dated: September 24, 2007

Respectfully submitted,

**A.G. EDWARDS & SONS, INC.**

By: _Steven J. Rotunno/ans_
   One of its attorneys.

Steven J. Rotunno
KUBASIAK, FYLSTRA, THORPE & ROTUNNO, P.C.
Two First National Plaza
29th Floor
20 South Clark Street
Chicago, Illinois 60603
(312) 630-9600 (Phone)
(312) 630-7939 (Fax)
srotunno@kftrlaw.com
Illinois Bar No.: 3122500
(Lead Counsel)

Counsel seeking to appear *pro hac vice*
Anthony Paduano
Joseph Gasperetti
Paduano & Weintraub LLP
1251 Avenue of the Americas
Ninth Floor
New York, New York 10020
(212) 785-9100 (Phone)
(212) 785-9099 (Fax)
ap@pwlawyers.com
jeg@pwlawyers.com