E-FILED
Tuesday, 25 September, 2007  04:23:16 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| A.G. EDWARDS & SONS, INC.,<br>a Delaware Corporation, | ) | **FILED** |
| | ) | SEP 24 2007 |
| Plaintiff, | ) | |
| | ) | JOHN M. WATERS, Clerk<br>U.S. DISTRICT COURT<br>CENTRAL DISTRICT OF ILLINOIS |
| v. | ) | Case No. |
| | ) | |
| RICHARD MARCOLLA, DANIEL BARRY,<br>THOMAS CUTRONE, KRISTA SAVAGE,<br>JOYCE GLANZMAN, KAREN LOESCHEN,<br>WILLIAM (RAMSAY) EASTERLING<br>and GENE HARSHMAN, individuals, | ) | **RECEIVED** |
| | ) | SEP 24 2007 |
| | ) | |
| Defendants. | ) | U.S. CLERK'S OFFICE<br>SPRINGFIELD, ILLINOIS |
| | ) | |

## PLAINTIFF A.G. EDWARDS & SONS, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION

Plaintiff A.G. Edwards & Sons, Inc. ("Edwards") submits the following memorandum of law in support of its motion for a temporary restraining order and a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure against defendants Richard Marcolla ("Marcolla"), Daniel Barry ("Barry"), Thomas Cutrone ("Cutrone"), Krista Savage ("Savage"), Joyce Glanzman ("Glanzman"), Karen Loeschen ("Loeschen"), William (Ramsay) Easterling ("Easterling") and Gene Harshman ("Harshman") (collectively "Defendants"). Edwards relies on the Affidavits of Charles Galli, sworn to on September 22, 2007 (the "Galli Aff."), and the Affidavit of David Saunders, sworn to on September 22, 2007 (the "Saunders Aff.").[1]

---

[1] In addition, Plaintiff submits herewith an Appendix of court and arbitration decisions in which employers have obtained similar interim injunctive relief.

For the reasons stated herein, Edwards requires the immediate entry of provisional relief, pending rulings on the merits by an arbitration panel of duly-appointed arbitrators pursuant to Rule 13804 of the Code of Arbitration Procedure for Industry Disputes of the Financial Industry Regulatory Authority ("FINRA"), which was created in July 2007 through the consolidation of the National Association of Securities Dealers, Inc. (the "NASD") and the member regulation, enforcement and arbitration functions of the New York Stock Exchange, to halt the use of Edwards confidential and proprietary client information and the solicitation by Defendants of Edwards' clients.

## **Preliminary Statement**

Defendants were the branch manager, six senior investment brokers and a registered financial associate in Edwards' Quincy, Illinois office until their mass resignation on or about September 21, 2007 to immediately join Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch"), a direct competitor of Edwards. In addition, Joyce Hoover-Clelland (wire operator), Valarie Wiewel (cashier) and Deana Smith (non-registered financial associate) in the Quincy office also terminated their employment with Edwards on September 21, 2007 and joined the Defendants at Merrill Lynch. On the same date as Defendants' mass resignation, Merrill Lynch opened an office in Quincy in the very same building as Edwards' Quincy office. Prior to opening this office, Merrill Lynch had no presence in Quincy or the surrounding area. As such, Edwards' Quincy office is now completely empty. Defendants have destroyed Edwards' Quincy branch office and are now in the process of stealing and attempting to steal Edwards' clients in the central Illinois area.

Defendants have breached their contracts and their common-law obligations to Edwards. In particular, Marcolla has improperly solicited Edwards' personnel to join him at his new

employer and has successfully wiped-out Edwards' entire Quincy office staff. Defendants have also violated the The Protocol for Broker Recruiting (the "Protocol"), to which both Edwards and Merrill Lynch are signatories, and breached their duty of loyalty to Edwards by converting confidential and trade secret information (protected by the Illinois Trade Secrets Act) and using this information to solicit Edwards' clients for the benefit of their new employer, Merrill Lynch.[2]

In sum, Edwards will be immediately and irreparably harmed by: (1) loss of personnel and complete destruction of the Quincy office; (2) disclosure of Edwards' trade secrets and confidential and proprietary information, including customer lists and business information, and the undermining of office protocols and procedures; (3) loss of confidentiality of customers' records and financial dealings; (4) loss of clients' and employees' confidence and trust, injury to Edwards' reputation and goodwill in Central Illinois; and (4) present economic loss, which is unascertainable at this time, and future economic loss, which is incalculable.

Edwards seeks only to maintain the status quo until such time as an arbitration panel convened by FINRA Dispute Resolution can issue a decision on the merits. Contemporaneously herewith, Edwards is commencing an arbitration with FINRA against Defendants, in which Edwards seeks, inter alia, permanent injunctive relief against Defendants.

For the reasons set forth below, Edwards' motion for a temporary restraining order and a preliminary injunction should be granted.

## Background Facts

The facts relative to Edwards' motion are set forth in detail in the Galli and Saunders Affidavits and will not be repeated herein. Defendants signed contracts that restricted their post-

---

[2]     The Protocol is annexed to the Saunders Affidavit as Exhibit A.

termination of employment conduct. Defendants' conduct is manifestly in breach of these contracts as well as their common law obligations to Edwards and these breaches must be stopped.

As is made clear by the Galli and Saunders Affidavits, Defendants have breached their contractual commitments to Edwards. Defendants -- in a raid orchestrated by Marcolla – have been plotting and secretly scheming to join Merrill Lynch for some time. In addition, Defendants are using Edwards' confidential client information to solicit Edwards' clients in conflict with their continuing contractual and fiduciary obligations to Edwards and in violation of the Protocol. To prevent further injury being suffered by Edwards, the Court should enter an injunction against Defendants.

## ARGUMENT

### POINT I

### EDWARDS IS ENTITLED TO INJUNCTIVE RELIEF

#### A.     Edwards Is Entitled To Seek An Injunction In This Court

Even where a dispute is ultimately to be resolved in arbitration, Edwards is entitled to injunctive relief pending the outcome in arbitration.[3]  Many federal circuit courts have held that a district court can grant injunctive relief in an arbitrable dispute pending arbitration, as long as the prerequisites for injunctive relief are satisfied. See, e.g., American Express Financial Advisors v. Makarawicz, 122 F.3d 936 (11th Cir. 1997); Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 910 F.2d 1049 (2d Cir. 1990); Ortho Pharmaceutical Corp. v. Amgen, Inc., 827 F.2d 806 (3d Cir. 1989); PMS Distributing Co., Inc., v. Huber & Suhner, A.G., 863 F.2d 639 (9th Cir. 1988);

---

[3]     Rule 13804 of the NASD Code of Arbitration Procedure for Industry Disputes requires a party seeking interim injunctive relief to obtain such relief from a court of competent jurisdiction. A

Teradyne, Inc. v. Mostek Corp. 797 F.2d 43 (1st Cir. 1986); Local Lodge No. 1266, Intern. Ass'n of

Machinists & Aerospace Workers, AFL-CIO v. Panoramic Corp., 668 F.2d 276, 285 (7th Cir. 1981);

Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cross, 1998 WL 122780, *1 (N.D. Ill. Mar. 13, 1998)

(Appendix, Tab 11).

**B.      Judicial Standard**

The standards for obtaining a temporary restraining order and preliminary injunctive

relief in this Court are well established.  The two standards in the jurisdiction are indeed identical.

Abbott Laboratories v. Andrx Pharmaceuticals, Inc., 2005 WL 1273105, *1 (N.D. Ill. May, 20 2005)

(Appendix, Tab 1); Long v. Board of Educ., 167 F. Supp. 2d 988, 990 (N.D. Ill. 2001); Charter

National Bank & Trust v. Charter One Financial, Inc., 2001 WL 527404 (N.D. Ill. May 15, 2001)

(Appendix, Tab 9).

A temporary restraining order will issue if the party seeking the injunction can make a

threshold showing that: (1) they have a reasonable likelihood of success on the merits; (2) no

adequate remedy at law exists; (3) they will suffer irreparable harm which, absent injunctive relief,

outweighs the irreparable harm the defendant will suffer if the injunction is granted; and (4) the

injunction will not harm the public interest.  Goodman v. Illinois Dept. of Fin. & Prof'l Regulation,

430 F.3d 432, 437 (7th Cir. 2005); Joelner v. Vill. of Washington Park, 378 F.3d 613, 620 (7th Cir.

2004).  See also LSBZ Inc. v. Brokis, 237 Ill. App. 3d 415, 425, 603 N.E.2d 1240 (2 Dist. 1992) (to

satisfy the first prong a party must establish that it possesses a clear right or interest needing

protection, such as confidential information).  The court, when considering all of these factors,

should apply a "sliding scale approach; the more likely the plaintiff will succeed on the merits, the

---

copy of such rule is annexed to the Galli Affidavit as Exhibit A.

less the balance of irreparable harm need favor the plaintiff's position." Joelner, 378 F.3d at 619; Ty, Inc. v. Jones Group, Inc., 237 F.3d 891, 895 (7th Cir. 2001). "To satisfy the first and fourth requirements, 'a plaintiff need only raise a fair question as to the existence of the right which [it] claims and lead the court to believe that [it] will probably be entitled to the relief requested if the proof sustains [its] allegations.'" LSBZ Inc., 237 Ill. App. 3d at 425.

### C.    Courts Have Almost Uniformly Recognized The Right Of A Securities Firm To Injunctive Relief Under Similar Circumstances

Numerous courts in Illinois and elsewhere in the country have recognized that insurance and securities firms are entitled to injunctive relief to enforce restrictive covenants set forth in employment contracts. Courts routinely have granted injunctive relief to specifically enforce contracts substantially similar to the contracts at issue herein. See e.g., The Prudential Ins. Co. of America v. Tourville, No. 03-C-0135 (E.D. Wis. Mar. 10, 2003) (Appendix, Tab 3); Walezonia v. The Prudential Ins. Co. of America, No. 02-C-4092 (N.D. Ill. Jul. 15, 2002) (Appendix, Tab 7); Merrill Lynch, Pierce, Fenner & Smith, Inc v. Salvano, 999 F.2d 211 (7th Cir. Jul. 8, 1993) (Appendix, Tab 17); Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Hegarty, 2 F.3d 405 (11th Cir. 1993), aff'g w/o opinion Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Hagerty, 808 F. Supp. 1555 (S.D. Fla. 1992); Prudential Ins. Co. v. Sipula, 776 F.2d 157 (7th Cir. Oct. 30, 1985) (Appendix, Tab 21); Ruscitto v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 948 F.2d 128 (5th Cir. 1991) (per curiam), aff'g 777 F. Supp. 1349 (N.D. Tex. 1991), cert. denied, 112 S. Ct. 1994 (1992); Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dutton, 844 F.2d 726 (10th Cir. 1986); Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley, 756 F.2d 1048 (4th Cir. 1985); Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Stidham, 658 F. 2d 1098 (5th Cir. 1981); IDS Financial Services v. Smithson, 843 F.

6

Supp. 415 (N.D. Ill. Feb. 4, 1994) (Appendix, Tab 16); <u>Lyle R. Jager, Agency, Inc. v. Steward</u>, 253

Ill. App. 3d 631, 625 N.E.2d 397 (1st Dist. 1993).  <u>See also</u> <u>Smith Barney Shearson, Inc. v. Merrill</u>

<u>Lynch, Pierce, Fenner & Smith, Inc.</u>, 1995 WL 708541, *4 (N.A.S.D. Oct. 10, 1995) (Appendix, Tab

15) (Merrill Lynch granted relief on claims against former brokers and competitor for breach of

contract and raiding a Merrill Lynch branch office).  In view of the consistency with which courts

have enforced restrictive covenants similar to those at issue, Edwards' right to such relief cannot be

seriously disputed.

 Moreover, Illinois courts have also recognized that a valid and signed restrictive

covenant imposes a fiduciary duty upon even a non-officer employee and that this duty survives the

termination of the employment relationship.  <u>See</u>, <u>e.g.</u>, <u>Labor Ready, Inc. v. Williams Staffing, LLC</u>,

149 F. Supp. 2d 398, 414 (N.D. Ill. 2001) ("while termination of employment typically ends a

fiduciary duty under Illinois law, this is not so where an employment contract contains a valid

restrictive covenant"); <u>Jostens, Inc. v. Kauffman</u>, 842 F. Supp. 352, 354 (C.D. Ill. 1994) ("As for the

covenant restricting Defendant from competing with Plaintiff for one year following his departure,

Defendant maintains that such a covenant cannot be a basis for a continuing common law fiduciary

duty by an ex-employee.  Defendant's argument is unpersuasive.")

 **D.**  <u>**Edwards Satisfies All Requirements For Injunctive Relief**</u>

  **1.**  <u>**Edwards Is Likely To Succeed On The Merits**</u>

   **a.**  **Injunctive Relief To Enforce Edwards' Contracts**
    <u>**Is Appropriate Under Illinois Law**</u>

 The first requirement for obtaining an injunction is demonstration of a reasonable

likelihood of success on the merits -- a prerequisite Edwards more than adequately satisfies.

Under Illinois law, an employer's trade secrets are a protectable interest.  See Liebert

Corp. v. Mazur, 357 Ill. App. 3d 265, 276 (2005).  A legitimate business interest exists if either: (1)

there are "near permanent business relationships" with customers, or (2) the defendant had access to

trade secrets and/or other confidential information of the employer by virtue of his or her

employment.  Lawrence & Allen, Inc. v. Cambridge Human Resource Group, 292 Ill. App. 3d 131,

141, 137 685 N.E.2d 434 (2d Dist. 1997).  See also Hanchett Paper Company v. Melchiorre, 341 Ill.

App. 3d 345, 351, 792 N.E.2d 395 (2d Dist. 2003) (Appendix, Tab 4).  "The factors considered in

determining whether a near-permanent relationship exists include: (1) the number of years required

to develop the clientele; (2) the amount of money invested to acquire clients; (3) the degree of

difficulty acquiring clients; (4) the extent of personal customer contact by the employee; (5) the

extent of the employer's knowledge of its clients; (6) the duration of the customers' association with

the employer; and (7) the continuity of the employer-customer relationship."  CUNA Mutual Life

Ins. Co. v. Kuperman, 1998 WL 409880, *6 (N.D. Ill. July 7, 1998) (former broker enjoined because

stock brokerage has near-permanent relationships with clients – even those clients obtained by the

broker himself) (Appendix, Tab 13).  Where the nature of the employer's business engenders

customer loyalty, the employer generally satisfies the near-permanency test.  Id.

Injunctive relief is necessary to protect Edwards' interests in its clients and client

information.  In this case, Defendants have compromised a legitimate business interest of Edwards'

for two reasons.  First, Edwards' long-term relationships with its clients represent precisely the type

of relationship that Illinois courts routinely classify as a "near-permanent" relationship.  See Galli

Aff. ¶ 57-62.  See also Hanchett Paper Company, 341 Ill. App. 3d at 353 (enforcing a noncompete

agreement where the employer had established that it maintained a "near permanent" relationship with its customer base) (Appendix, Tab 4).

Second, Defendants' status as registered representatives provided them access to Edwards' confidential and proprietary business information. At the time of their mass resignation, Defendants were assigned to serve about 5,100 of Edwards' customer accounts, and as such, had access to extensive client information including, without limitation, Edwards' clients' names, addresses, telephone numbers, income, net worth, social security numbers, birth dates, contract renewal dates, account statements, and financial portfolio and asset allocation. See Galli Aff. ¶ 2, 57. In particular, Marcolla, in his capacity as the highest ranking individual working in Edwards' Quincy office, was responsible for, among other things, the management of the branch including its files, client accounts and security. See Galli Aff. ¶ 10-11. This client information is not generally known to, or readily ascertainable by, Edwards' competitors. Indeed, Defendants signed employment agreements with Edwards which recognize that Edwards' client information is confidential. See Galli Aff. ¶ 12-47. In addition, Defendants were also bound by Edwards' confidentiality policy as set forth in section 9.2 of Edwards' Sales Practice Manual and Edwards' Code of Ethical Conduct, which provide that client information is confidential. See Galli Aff. ¶ 48-49.

And, furthermore, this information qualifies as a trade secret under the Illinois Trade Secrets Act ("ITSA"), 765 ILCS 1065, et seq. The ITSA, enacted in Illinois in 1988, defines a trade secret as, inter alia, financial data or a list of actual or potential customers that:

> (1) is sufficiently secret to derive independent economic value, actual or potential, from not being generally known to, and not being readily

ascertainable by, other persons who can obtain economic value from its disclosure or use; and

(2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.  765 ILCS 1065/2(d).

Furthermore, when determining whether a trade secret exists courts often consider six factors: (1) the extent to which the information is known outside the plaintiff's business; (2) the extent to which it is known by employees and others involved in the plaintiff's business; (3) the extent of measures taken by the plaintiff to guard the secrecy of the information; (4) the value of the information to the plaintiff and to the plaintiff's competitors; (5) the amount of effort or money expended by the plaintiff in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.  Liebert, 357 Ill. App. 3d at 277.  Notably, Defendants new employer, Merrill Lynch, has even argued that customer lists are entitled to trade secret protection under Illinois law. See Merrill Lynch v. Cross, 1998 WL 122780 at *2 ("Customer lists are entitled to trade secret protection under Illinois law.") (Appendix, Tab 11).

Moreover, as detailed in the Galli Affidavit, Edwards has adopted strict security procedures to maintain the confidentiality of its customer and business information, and such steps, when taken to limit the information's accessibility within the organization, militate in favor of a finding that said information constitutes a "trade secret". See, e.g., Liebert Corp., 357 Ill. App. 3d at 279 (recognizing that evidence that employers advised their employees, verbally or in writing, about the information's confidentiality satisfies the "reasonable steps" test for finding that a trade secret exists); Elmer Miller, Inc. v. Landis, 253 Ill. App. 3d 129, 133 (1st Dist. Sept. 9, 1993) (information carefully guarded, on a "need-to-know" basis, and not made available to other employees, who did not service the accounts in question qualified as trade secret) (Appendix, Tab 18); RKI, Inc. v.

10

Grimes, 177 F. Supp. 2d 859, 875 (N.D. Ill. 2001) (confidentiality agreements and employee handbooks advised of the confidential nature of the plaintiff's information).

Not surprisingly, then, Illinois courts have afforded trade secret protection to the customer information of companies engaged in the securities industry. See e.g., Nicor Energy v. Dillon, 2003 WL 21698422, *4 (N.D. Ill. July 30, 2003) (customer lists and general information concerning clients qualify as trade secrets if not readily ascertainable) (Appendix, Tab 5); IDS Financial Services, Inc. v. Smithson, 843 F. Supp. 415, 418 (N.D. Ill. 1994) (same) (Appendix, Tab 16). See also Stampede Tool Warehouse, Inc. v. May, 272 Ill. App. 3d 580, 589, 651 N.E.2d 209 (1st Dist. Mar. 22, 1995) (customer list is trade secret under ITSA) (Appendix, Tab 14).

In fact, Illinois courts also have pronounced that an employer may have a protectible interest in confidential information even if it does not rise to the level of a trade secret. As the Appellate Court, First Division, clearly stated in A.B. Dick Company v. American Pro-Tech, 159 Ill. App.3d 786 (1 Dist. 1987) "trade secrets or other confidential information are not necessary to establish a protectible interest." 159 Ill. App.3d at 793 (Appendix, Tab 20). Rather, the requisite determination that the employer had a protectible interest is satisfied in cases in which "the employee acquired confidential information through his employment and subsequently attempted to use it for his or her own benefit," or in which "but for the association with the employer, the employee would not have had contact with the customers." Id.

It would be absurd to contend that Edwards has no legitimate interest in protecting its confidential client information or the relationships it has forged with clients. Along with its employees, Edwards' clients are its most important assets. Defendants should not be allowed to injure their former employer by using such information to pirate away Edwards' clients.

11

## 2.   Edwards Has No Adequate Remedy at Law and Will Suffer Irreparable Harm

Edwards also has met the second and third requirements for obtaining injunctive relief -- namely, that no adequate remedy at law exists, and that Edwards will suffer irreparable harm if no injunctive relief is granted.

It is extremely difficult to quantify the future economic losses that Edwards will suffer due to the loss of clients, talented agents and employees to a competitor. It is not clear how many accounts Defendants would obtain in the future, or how many of their current accounts they would increase during their time of employment. Likewise, it is not clear how long Defendants and the other three employees that left Edwards to join Merrill Lynch would have continued their employment with Edwards had they not been raided by Marcolla.

A second aspect of irreparable harm, and inadequacy of a legal remedy, is the loss of client confidence that will occur absent an injunction. The loss of confidence will occur because these clients will have their reasonable expectation of privacy destroyed. Edwards' clients expect their financial information to be kept confidential. If Defendants' conduct continues unrestrained, the clients' trust and confidence in Edwards will be permanently impaired in a way that cannot be quantified. The inadequacy of legal remedies and the threat of irreparable harm are inherent in cases such as these when the destruction of customer goodwill and trade secrets are at issue. See Duct-O-Wire Co. v. U.S. Crane, Inc., 31 F.3d 506, 509 (7th Cir. 1994); Gateway Eastern Railway Co. v. Terminal Railroad Ass'n of St. Louis, 35 F.3d 1134, 1140 (7th Cir. 1994); Merrill Lynch v. Salvano, 999 F.2d at 211 (Appendix, Tab 17).

12

Numerous courts have relied upon the preceding factor to find irreparable harm justifying an injunction. See e.g., Salvano, *supra,* 999 F.2d at 215; Cross, 1998 WL 122780 at *2 (potential risk of disclosure of client's confidential information poses an irreparable harm) (Appendix, Tab 11).  For example, in Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Rodger, 75 F. Supp. 2d 375, 381-82 (M.D. Pa. 1999), Merrill Lynch made the exact same arguments that Edwards makes here that "customers will lose trust and confidence in [Merrill Lynch] if they discover that ex-employees have divulged to others private financial information like account value, market transactions and investment assets"; the court found such loss constituted irreparable harm. Likewise, in Edwards Insurance Company of America. v. Barone, 1998 WL 269065, *7 (W.D.N.Y. May 19, 1998) (Appendix, Tab 12), the court found irreparable injury where a departed insurance agent replaced Prudential contracts, stating "[s]uch conduct threatens to diminish Prudential's goodwill and to devalue its trade secrets.  Such harms are irreparable."  See also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Kramer, 816 F. Supp. 1242, 1247 (N.D. Oh. 1992) ("[i]rreparable and immeasurable harm lies in the fact that Merrill Lynch clients, when they discover that their financial information, market transactions, and investment assets which they presumed were held in confidence have been disclosed, will lose trust and confidence in Merrill Lynch.").

In sum, Edwards has easily satisfied the second and third requirements for obtaining injunctive relief.  Indeed, the Illinois Legislature wisely recognized the irreparable nature of the harm that stems from a loss of trade secrets, insofar as it expressly authorized in the Illinois Trade Secrets Act that "actual or threatened misappropriation may be enjoined."  765 ILCS 1065/3(a).

13

### 3. The Balance of Hardships Weighs in Edwards' Favor and An Injunction Would Not Harm The Public Interest

Finally, Edwards can show that the balance of hardships tips in its favor, and the public interest will not be harmed by issuance of an injunction. Indeed, the benefit of injunctive relief to Edwards significantly outweighs any possible hardship to Defendants. On the one hand, an injunction would protect Edwards' goodwill, its investment in its employees, its contract rights, and by extension its investment in those clients serviced by its employees. Moreover, an injunction would promote the public interest in the enforcement of employees' reasonable agreements and the protection of the investment made by businesses in the development of their business and the confidentiality of client records. An injunction would also serve to discourage Edwards' former employees and competitors from inducing Edwards' employees to breach their contracts, their fiduciary duties and their duties of loyalty. As shown above, numerous courts have regularly issued injunctions to protect financial services firms from the effects of disloyal employees, and courts have routinely prohibited employees from soliciting their former co-workers.

On the other hand, enjoining Defendants from continuing to breach their contractual obligations cannot be said to impose a hardship. Defendants have no equities on their side. The agreements do not prevent Defendants from working in their chosen field or from competing with Edwards. Edwards seeks merely to enjoin Defendants' pirating of one of its most precious business assets, its clients. All that is sought is an injunction preventing Defendants from using information they acquired as Edwards employees. Defendants will suffer no adverse financial consequences if they are enjoined from soliciting Edwards' clients and otherwise have the contracts they signed with Edwards enforced against them. See e.g., Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Patinkin,

14

1991 WL 83163, *5 (N.D. Ill. May 9, 1991) ("There is no great public harm from the clients' temporary loss of [defendant's] services. His clients, like those of many others before him, can find other brokers to manage their accounts until this matter is resolved by the arbitration board.") (Appendix, Tab 19). Defendants have intentionally breached their contractual commitments and have deliberately misappropriated Edwards' trade secret property. As noted by the United States District Court for the Northern District of Illinois, in a case similar to the instant one:

> The public has an interest in preventing unfair competition, commercial piracy, misleading solicitations and in safeguarding the confidentiality of financial records. Consequently, the public interest has been disserved by Defendant' actions. The public has no interest in destroying contracts, rewarding theft, and encouraging unethical business behavior.

IDS Life Ins. Co. v. Sun America, Inc., 958 F. Supp. 1258, 1282 (N.D. Ill. 1997), aff'd in part, vacated in part, 136 F.3d 537 (7th Cir. 1998). The loss to Edwards greatly outweighs any potential harm to Defendants.

Edwards has, accordingly, satisfied the four elements necessary to obtain an award of injunctive relief.

### C. Edwards Is Entitled to Injunctive Relief Because Marcolla Has Violated His Restrictive Covenant By Recruiting His Former Edwards' Employees on Behalf Of Merrill Lynch

Marcolla has improperly solicited Edwards' personnel to join him at his new employer and has successfully wiped-out Edwards' entire Quincy office staff. As such, Marcolla's conduct furnishes Edwards a separate and independent basis for injunctive relief. Notwithstanding the clear violation of his employment agreements and Edwards' confidentiality policy, Illinois law further prohibits Marcolla's solicitation and recruitment of Edwards' agents on Merrill Lynch's behalf, because Marcolla began this tortious campaign while he was still an employee of Edwards.

Such misconduct constitutes a breach of the fiduciary duty of loyalty Marcolla owes Edwards as one of its branch managers.  Labor Ready, 149 F. Supp. 2d at 414-5 (citing Anderson v. Burton Assocs., Ltd., 218 Ill. App. 3d 261, 578 N.E.2d 199, 202 (1st Dist. 1991)).

In other words, courts repeatedly have held solicitation of a firm's employees by a fellow employee prior to moving to a new employer, as Marcolla has done, to represent an actionable breach of the employee's fiduciary duty of loyalty.  Labor Ready, 149 F. Supp. 2d at 414-5; Hill v. Names & Addresses, Inc., 212 Ill. App. 3d 1065, 1079, 571 N.E.2d 1085, 1094 (1st Dist. 1991) (citing ABC Trans Nat'l. Transport v. Aero Forwarders, 90 Ill. App. 3d at 824, 413 N.E.2d 1299 (1st Dist. 1980)); Veco Corp. v. Babcock, 243 Ill.App.3d 153, 160 (1st Dist. 1993) ("former employees may compete with their former employer and solicit former customers so long as there was no demonstrable business activity by the former employee before the termination of employment"). Similarly, arbitration panels have found that the premeditated and illegal campaigns to "raid" another firm's employees violates industry rules and other laws and awarded the injured employer substantial damages.  See e.g., Miller Johnson Steichen Kinnard, Inc. v. Northland Sec., Inc., 2004 WL 2191746, *5-6 (N.A.S.D. Sept. 13, 2004) (Appendix, Tab 2); Duncan-Williams, Inc. v. Coastal Sec., L.P., 2003 WL 21854019, *4 (N.A.S.D. Aug. 3, 2003) (Appendix, Tab 6); Fahnestock & Co. Inc. v. Tucker Anthony Sutro & Co., 2001 WL 260101, *2 (N.A.S.D. Jan. 12, 2001) (Appendix, Tab 8); John Kinnard & Co., Inc. v. Dain Rauscher, Inc., 1999 WL 33748442, *4 (N.A.S.D. Dec. 10, 1999) (Appendix, Tab 10).

## Conclusion

For the reasons stated above, Edwards' motion for a temporary restraining order and a preliminary injunction should be granted, pending a final award in the FINRA arbitration between Edwards and Defendants, and that it be allowed to commence discovery immediately.

Dated: September 24, 2007

Respectfully submitted,

**A.G. EDWARDS & SONS, INC.**

By: _____
        Steven J. Rotunno
KUBASIAK, FYLSTRA, THORPE & ROTUNNO, P.C.
Two First National Plaza
29th Floor
20 South Clark Street
Chicago, Illinois  60603
(312) 630-9600 (Phone)
(312) 630-7939 (Fax)
srotunno@kftrlaw.com
Illinois Bar No.:  3122500
(Lead Counsel)

Counsel seeking to appear *pro hac vice*
Anthony Paduano
Joseph Gasperetti
Paduano & Weintraub LLP
1251 Avenue of the Americas
Ninth Floor
New York, New York  10020
(212) 785-9100 (Phone)
(212) 785-9099 (Fax)
jeg@pwlawyers.com
ap@pwlawyers.com

17

# PLAINTIFF'S APPENDIX OF
## RELEVANT COURT AND ARBITRATION DECISIONS

1.  <u>Abbott Laboratories v. Andrx Pharmaceuticals, Inc.</u>, 2005 WL 1273105 (N.D. Ill. May 20, 2005)

2.  <u>Miller Johnson Steichen Kinnard, Inc. v. Northland Sec., Inc.</u>, 2004 WL 2191746 (N.A.S.D. Sept. 13, 2004)

3.  <u>The Prudential Ins. Co. of America v. Tourville</u>, No. 03-C-0135 (E.D. Wis. Mar. 10, 2003)

4.  <u>Hanchett Paper Company v. Melchiorre</u>, 341 Ill. App. 3d 345, 792 N.E.2d 395 (2d Dist. 2003)

5.  <u>Nicor Energy v. Dillon</u>, 2003 WL 21698422 (N.D. Ill. Jul. 30, 2003)

6.  <u>Duncan-Williams, Inc. v. Coastal Sec., L.P.</u>, 2003 WL 21854019 (N.A.S.D. Aug. 3, 2003)

7.  <u>Walezonia v. The Prudential Ins. Co. of America</u>, No. 02-C-4092 (N.D. Ill. Jul.15, 2002)

8.  <u>Fahnestock & Co. Inc. v. Tucker Anthony Sutro & Co.</u>, 2001 WL 260101 (N.A.S.D. Jan. 12, 2001)

9.  <u>Charter National Bank & Trust v. Charter One Financial, Inc.</u>, 2001 WL 527404 (N.D. Ill. May 15, 2001)

10. <u>John Kinnard & Co., Inc. v. Dain Rauscher, Inc.</u>, 1999 WL 33748442 (N.A.S.D. Dec. 10, 1999)

11. <u>Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cross</u>, 1998 WL 122780 (N.D. Ill. Mar. 13, 1998)

12. <u>Edwards Insurance Company of America. v. Barone</u>, 1998 WL 269065 (W.D.N.Y. May 19, 1998)

13. <u>CUNA Mutual Life Ins. Co. v. Kuperman</u>, 1998 WL 409880 (N.D. Ill. July 7, 1998)

14. <u>Stampede Tool Warehouse, Inc. v. May</u>, 272 Ill. App. 3d 580, 651 N.E.2d 209 (1st Dist. 1995)

15. <u>Smith Barney Shearson, Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 1995 WL 708541 (N.A.S.D. Oct. 10, 1995)

16.   <u>IDS Financial Services, Inc. v. Smithson</u>, 843 F. Supp. 415 (N.D. Ill. 1994)

17.   <u>Merrill Lynch, Pierce, Fenner & Smith v. Salvano</u>, 999 F.2d 211 (7th Cir. 1993)

18.   <u>Elmer Miller, Inc. v. Landis</u>, 253 Ill. App. 3d 129 (1st Dist. 1993)

19.   <u>Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Patinkin</u>, 1991 WL 83163 (N.D. Ill. May 9, 1991)

20.   <u>A.B. Dick Company v. American Pro-Tech</u>, 159 Ill. App.3d 786 (1 Dist. 1987)

21.   <u>Prudential Ins. Co. v. Sipula</u>, 776 F.2d 157 (7th Cir. 1985)

**EXHIBIT 1**

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1273105 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

Page 1

**H**

Abbott Laboratories v. Andrx Pharmaceuticals, Inc.
N.D.Ill.,2005.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern
Division.
ABBOTT LABORATORIES, Plaintiff,
v.
ANDRX PHARMACEUTICALS, INC., Teva
Pharmaceuticals USA, Inc., and Roxane
Laboratories, Inc. Defendants.
No. 05 C 1490.

May 20, 2005.

Edward L. Foote, Michael Alan Flomenhoft, R.
Mark Mccareins, Todd Jay Ehlman, Winston &
Strawn, Chicago, IL, Andrea Weiss Jeffries, Jeffrey
I. Weinberger, Ted G. Dane, Munger, Tolles &
Olson, LLP, Los Angeles, CA, Jennifer L. Polse,
Munger Tolles & Olson LLLP, San Francisco, CA,
for Plaintiff.
David M. Airan, Robert F. Green, Leydig, Voit &
Mayer, Ltd., Erik F. Dyhrkopp, Michael Sennett,
Wonah Kim Ross, Bell Boyd & Lloyd, Kenneth G.
Schuler, Amanda Jean Hollis, Latham & Watkins
LLP, Chicago, IL, James Galbraith, Maria L.
Palmese, Colman B. Ragan, Cynthia M. Lambert,
Robert V. Cerwinski, Kenyon & Kenyon, Steven C.
Cherny, Latham & Watkins LLP, New York, NY,
Matthew Rawlinson, Latham & Watkins LLP,
Menlo Park, CA, for Defendants.

COAR, J.

**\*1** This matter comes before this Court on the
application of plaintiff, Abbott Laboratories
("Abbott"), for a temporary restraining order
against defendant, Teva Pharmaceuticals USA, Inc.
("Teva"). Plaintiff seeks to enjoin Defendant Teva
from marketing a generic antibiotic drug,
clarithromycin, in its extended release ("XL") form,
that allegedly infringes Plaintiff's U.S. Patent Nos.
4,680,386 ("the '386 patent"); 6,010,718 ("the '718
patent"); and 6,551,616 ("the '616 patent"), relating
to its Biaxin XL product. Because Teva represents

that it received approval of its Abbreviated New
Drug Application ("ANDA") from the United
States Food and Drug Administration on May 18,
2005, and has indicated that it intends to introduce
its product to the market on May 24, 2005,
following the May 23, 2005 expiration of Plaintiff's
U.S. Patent No. 4,331,803 on the clarithromycin
compound itself, this Court will not recite the full
legal and factual context of this case. Some of that
background is contained in the record of previous
litigation between these parties over these and
related patents. *See Teva Pharma. USA, Inc. v.
Abbott Labs.,* No. 04 C 2436, 2004 WL 2271827
(N.D.Ill. Oct.7, 2004); *Teva Pharma. USA, Inc. v.
Abbott Labs.,* 301 F.Supp.2d 819 (N.D.Ill.2004).
The following findings and conclusions are entered
pursuant to Federal Rule of Civil Procedure 65(d)
to support issuance of the temporary restraining
order.

### I. TEMPORARY RESTRAINING ORDER STANDARD

A temporary restraining order ("TRO") is an
emergency remedy issued to maintain the status
quo until a hearing can be held on an application
for a preliminary injunction. *Coca-Cola Co. v.
Alma-Leo U.S.A., Inc.,* 719 F.Supp. 725, 726
(N.D.Ill.1989). A TRO, like a preliminary
injunction, is designed to minimize the hardship to
the parties pending the ultimate resolution of the
lawsuit. *Faheem-El v. Klincar,* 841 F.2d 712, 717
(7th Cir.1988). The standards for a TRO and a
preliminary injunction are functionally identical in
this circuit. *Bernina of America, Inc. v. Fashion
Fabrics Int'l,* 2001 WL 128164, at \*1 (N.D.Ill.
Feb.9, 2001).

A party seeking injunctive relief, including the
entry of a TRO, must make a four-part threshold
showing that (1) the movant has some likelihood of
success on the merits of the underlying litigation;
(2) immediate irreparable harm will result if the
relief is not granted; (3) the balance of the
hardships weighs in the movant's favor; and (4) the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1273105 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

impact on the public interest is in favor of the relief. *Polymer Techs., Inc. v. Bridwell,* 103 F.3d 970, 973 (Fed.Cir.1996); *see also Duct-O-Wire Co. v. U.S. Crane, Inc.,* 31 F.3d 506, 506 (7th Cir.1994). The movant's TRO can only be granted if it can establish both of the first two factors, specifically, likelihood of success on the merits and irreparable harm. *Amazon.com, Inc. v. Barnesandnoble.com, Inc.,* 239 F.3d 1343, 1350 (Fed.Cir.2001).

## II. DISCUSSION

### A. Likelihood of Success on the Merits

*2 In order to demonstrate a likelihood of success on the merits, Abbott must show, in light of the presumptions and burdens that will be present at any eventual trial on the merits, that it is likely to prove Teva infringed its patents, and that any of Teva's challenges to the validity and enforcement of its asserted patents lack substantial merit. *Amazon.com, Inc. v. Barnesandnoble.com, Inc.,* 239 F.3d 1343, 1350-51 (Fed.Cir.2001). In cases, such as this, that involve multiple patent claims, the patentee must demonstrate that it will likely prove infringement of at least one, if not more, of the claims of the patents-in-suit. *Id.* at 1351.In addition, it must also demonstrate that at least one of the same allegedly infringed patent claims will likely survive any validity challenges asserted by the alleged infringer.*Id.*

### 1. Infringement

A patent infringement analysis requires the court to construe the claims and then compare them to the allegedly infringing product. To be infringing, every limitation of the asserted patent claims must be found in the allegedly infringing product, either literally or by equivalence. *SmithKline Diagnostics, Inc. v. Helena Labs. Corp.,* 859 F.2d 878, 889 (Fed.Cir.1988).

Teva does not argue that it would not be infringing the asserted patents if they were valid, but rather asserts patent invalidity as to all three patents-in-suit. For that reason, this Court will assume that

Abbott has demonstrated a likelihood that it would prevail on the merits of infringement, on the condition that the patents are found to be valid.

### 2. Validity

A validity challenge during TRO or preliminary injunction proceedings can succeed on evidence that would not support a judgment of validity at trial.[FN1]*Amazon.com,* 239 F.3d at 1359. "Vulnerability is the issue at the preliminary injunction stage, while validity is the issue at trial."*Id.* The patentee also is held to a less stringent standard and must only present a "clear case supporting the validity of the patent in suit."*Id.* A patentee can make such a case by showing, for example, that the patent in suit has withstood previous validity challenges in other proceedings or benefitted from a long period of industry acquiescence in its validity.

> FN1. Abbott asserts that patents are entitled to a statutory presumption of validity. This overstates the case by confusing the burden on the challenger at the trial stage with the burden on the challenger at this earlier point in the proceedings.

Teva argues that Abbott's "extended release" patents, including the '718 and '616 patents, are invalid because of obviousness. Teva contends that extended release products are well-documented and have been on the market for many years; in addition, Teva asserts that XL forms of drugs that are almost identical to Abbott's Biaxin XL have been described in the prior art. Specifically, Teva asserts that Abbott's '718 patent claims simply restate a textbook definition of an extended release formulation. Thus, persons skilled in the art would recognize the value of extended release formulations and would have considered making the formulation in question an obvious next step.

In order to defeat Teva's invalidity defense, Abbott must show that Teva's defense lacks substantial merit. Abbott asserts that obviousness is a weak argument against patent validity because inventions

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1273105 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

often seem obvious when viewed in hindsight.[FN2]Abbott notes that the Federal Circuit cautioned against a so-called hindsight trap. *Iron-Grip Barbell Co., Inc. v. USA Sports, Inc.,* 392 F.3d 1317, 1320 (Fed.Cir.2004). Abbott contends that although it did not invent the concept of extended release formulations, it did successfully determine how to formulate Biaxin XL such that the compound would have the characteristics described in the patent claims asserted. (TRO Tr. at 39-31.) As evidence of the nonobviousness of this kind of invention, Abbott points to its (unasserted) '190 patent for a similar compound which was ultimately unsuccessful. In addition, Abbott contends that, prior to its formulation patents, there was no teaching anywhere on how to make an extended release formulation of clarithromycin. Abbott was the first to devise an extended release formulation using polymers for this compound of clarithromycin that achieved such desirable elements as reduced blood concentration fluctuation and reduced taste perversion. Abbott contends that it provided the prior art related to its extended release formulation patents to the United States Patent and Trademark Office when it applied for its patents, and that the patent examiner determined the compound merited a patent nonetheless. (TRO Tr. at 28.)

> FN2. This might most pithily be described as the "hindsight is always 20/20" argument.

### a. The '386 Patent

*3 The '386 patent covers a compound, called "clarithromycin 9-oxime," which is a chemical compound formed during the most commonly used and most efficient process for the synthesis of clarithromycin. In the '386 patent, the compound is described as "useful as an intermediate for preparation" of clarithromycin, and useful as an antibacterial agent, or drug. The patent covers only the 9-oxime compound; it does not cover the process that generates it. From the record, it appears Abbott has not sought approval for the compound as a pharmaceutical, nor has it obtained

a patent on the process for making clarithromycin.

Teva argues that the '386 patent is invalid because a person skilled in the art at the time would have found it obvious that clarithromycin 9-oxime would be a probable antibacterial agent and intermediate substance in the synthesis of other compounds. Even if the patent is not invalid, Teva contends that Abbott is not entitled to injunctive relief because the product is present in Teva's generic clarithromycin XL, if at all, at approximately one part-per-million ("ppm"). Teva contends that this impurity is so minuscule that no consumer will ever know it is present and that its presence in now way enhances the product or Teva's ability to sell the product.

The patent says the compound is useful in two ways; first, as a drug, and second, as an intermediate in producing other drugs. However, the 9-oxime compound is not an approved drug substance in the United States or any other country. It is not clear from the evidence presented that 9-oxime has "value" as a drug. The Court is troubled by the notion that Abbott did not (or could not) obtain a patent on the process directly, but seeks to accomplish that same result by claiming the presence of a by-product of that process. For that reason, the Court concludes that Abbott has not established likelihood of success as to the '386 patent.

### B. Immediate, Irreparable Harm

A TRO movant must also demonstrate that it would suffer immediate and irreparable harm in the absence of injunctive relief. A presumption of irreparable harm attaches when a clear showing of patent validity and infringement has been made. *Amazon.com,* 239 F.3d at 1350.

Abbott contends that it has made a clear showing of patent validity and infringement. It also asserts that "the principal value of the patent is its statutory right to exclude."*Hybritech Inc. v. Abbott Labs.,* 849 F.2d 1446, 1456 (Fed.Cir.1988). In the alternative, Abbott contends that there is ample evidence that it will suffer "irreversible losses" if

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1273105 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

Page 4

Teva is allowed to come to market on May 24, 2005. In support of this contention, Abbott submits the declaration of its Biaxin brand manager, who asserts that Abbott will experience "rapid, substantial market share losses and lost profits," and "a dramatic reduction in the demand for Abbott's branded products" (e.g., Biaxin XL). (Pl.'s Br. at 11.) Even if Teva's generic XL product enters and then is taken off of the market, Abbott states that it will be unable to recover more than a "fraction" of its lost market share. First, it contends that managed care and insurance companies will shift Biaxin XL to a higher tier on their formularies, meaning that it will no longer have the favorable position it currently enjoys. Even after the exit of a generic clarithromycin XL, Abbott contends that, it will be unable to regain market share because doctors will prefer to prescribe drugs from the lower tier with lower out-of-pocket expenses to patients. Abbott asserts that it is unlikely that Biaxin XL would be able to regain its position on tier 2 of many managed care and insurance formularies or to be returned to the Medicaid formulary after the entry and possible exit of a generic clarithromycin XL because the pharmaceutical market has changed too much since Biaxin XL was first introduced. In short, Biaxin XL would no longer "be seen as a new product with significant advantages."(McKercher Decl. at ¶ 42.) Over the course of two months after entry of a generic clarithromycin XL, Abbott predicts it will lose over sixty percent of its pre-IR generic entry sales. In financial terms, Abbott estimates that it will face lost profits of approximately $1.37 billion in present value terms over the remaining twelve years of the patents. In immediate staffing terms, Abbott estimates it would have to lay off approximately four hundred Biaxin brand sales representatives.[FN3] (Pl.'s Br. at 13, n. 14.)

FN3. Abbott does not state whether these are dedicated Biaxin sales representatives who sell no other product or whether these sales representatives sell Biaxin as part of a portfolio of products.

*4 Teva, predictably, asserts that Abbott cannot

demonstrate that it faces imminent irreparable harm. First, Teva contends that Abbott's assessment of the impact of Teva's entry is entirely speculative. Moreover, Abbott's source for this assessment is the brand manager of Biaxin at Abbott, a person whose interest in the instant litigation is not insubstantial. Teva contends that Abbott bases its damages estimate on wildly overinflated sales predictions, essentially predicting sales at the current pace for the twelve years remaining on the patents. However, Teva states that the Biaxin product, like any other pharmaceutical, faces a predictable life cycle with declining sales over time. Moreover, Abbott provides little more than speculation in support of its contention that consumers and insurers would be unwilling to pay for Abbott's Biaxin XL after the exit of a generic XL competitor if they were willing to pay for it before the generic entered. Abbott's provides no support or background information for its predictions about market share erosion after entry of a generic or their derivation.

In addition, Teva points to the imminent entry of generic competition against Abbott's immediate release ("IR") clarithromycin product (Biaxin) as a market eroding factor for extended release clarithromycin. The IR and XL products are the same molecule but with different delivery profiles. For many patients and doctors, they are close substitutes. Managed care, insurance companies, and other customers with pharmaceutical formularies may well give preference to cheaper generic IR formulations. Teva's expert economist states that in corollary situations with other drugs, where a generic immediate release product entered a market that contained both a branded immediate release and a branded extended release product, the generic IR caused a drop in prescriptions for the branded XL product of approximately sixty percent. Thus, Teva contends that any predicted harm will be the result of generic competition in the immediate release market, not the extended release arena.

The parties' models of how the market will react to the entry of a generic clarithromycin extended

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1273105 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

release product are both speculative. This is doubly so because of the certain entrance of immediate-release versions on or after May 24, 2005. There simply is no experience from which accurately to predict whether physicians will continue to prescribe a higher cost branded XL product over a lower priced IR product, despite the advantages (reduced gastrointestinal distress, ease of use, etc.) of the more expensive product. Abbott predicts a slight (15%) market share erosion for its Biaxin XL after entry of a generic IR product and Teva predicts a more dramatic decrease. On the record here, the Court concludes that Abbott will suffer some market erosion (greater than 15%) because of the imminent entry of the generic IR products, but that the market for Abbott's Biaxin XL will remain large, absent the entry of a generic XL product. The introduction of Teva's generic XL product will crush the market for Biaxin XL.

### C. Balance of Hardships

**\*5** Teva contends that if Abbott ultimately prevails on the merits in this case, any harm to Abbott can be satisfied by the payment of money. This argument flies in the fact of established law to the effect that damage is presumed from a patent violation and that the ultimate damage is loss of exclusivity. Money damages may be the best available remedy after trial, but at this early stage in the case, maintaining exclusivity until there can be a more complete airing of the issues is a better approach. That is especially true where, as here, any harm to Teva will be slight-delaying entry of its XL product for a few days or weeks.

### D. Impact on Public Interest

There is great temptation to conclude that the public would be best served by permitting access to a low-cost alternative to a beneficial product. To approach this issue that way, however, would be to eviscerate patent law. The public interest in creating incentives to invent useful or desirable products is captured in the patent law. The paramount incentive is exclusivity. The public interest is best served, at this preliminary stage, by

maintaining that exclusivity.

### Conclusion

For the foregoing reasons, this Court grants Plaintiff's application for a temporary restraining order. The TRO will expire of its own force at 3 p.m. on May 30, 2005.

N.D.Ill.,2005.
Abbott Laboratories v. Andrx Pharmaceuticals, Inc.
Not Reported in F.Supp.2d, 2005 WL 1273105 (N.D.Ill.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 2**

Westlaw.

2004 WL 2191746 (N.A.S.D.)                                                Page 1


2004 WL 2191746 (N.A.S.D.)

National Association of Securities Dealers, Inc.
**\*1** IN THE MATTER OF THE ARBITRATION BETWEEN
CLAIMANT, MILLER JOHNSON STEICHEN KINNARD, INC. v.
RESPONDENTS, NORTHLAND SECURITIES, INC., THOMAS BARTZEN, MARK BEESE, STEVEN
MATTSON, J. PATRICK MALONEY III, RICHARD REYNOLDS, SETH KAHN, BRIAN KUJAWA, PAUL
DONNA, STEVEN GAPINSKI, GRACIA BUTWIN, NICHOLAS SKARICH, RYAN MCENERNEY, BRYAN
JOHNSON, CYNDY LITKE AND GARY NELSON
COUNTER-CLAIMANTS, NORTHLAND SECURITIES, INC., THOMAS BARTZEN, MARK BEESE, STEVEN
MATTSON, J. PATRICK MALONEY III, RICHARD REYNOLDS, SETH KAHN, PAUL DONNA, NICHOLAS
SKARICH AND GARY NELSON v.
COUNTER-RESPONDENT, MILLER JOHNSON STEICHEN KINNARD, INC.
THIRD-PARTY CLAIMANTS, NORTHLAND SECURITIES, INC., THOMAS BARTZEN, MARK BEESE,
STEVEN MATTSON, J. PATRICK MALONEY III, RICHARD REYNOLDS, SETH KAHN, PAUL DONNA,
NICHOLAS SKARICH AND GARY NELSON v.
THIRD-PARTY RESPONDENTS, ELDON MILLER, DAVID JOHNSON, TODD MILLER, JEFFREY HOUDEK,
MICHAEL MARTSON, KRISTI LEFFERTS AND JEFFREY OLSON

Docket Number
**02**
-
**06736**

Date of Service (NASD use only): September 15, 2004
Signature Date: September 14, 2004

Signature Date: September 13, 2004


**AWARD**

Minneapolis, Minnesota

Nature of Dispute: Member v. Member and Associated Persons; Member and Associated
Persons v. Member; and Member and Associated Persons v. Associated Persons

**REPRESENTATION OF PARTIES:** Miller Johnson Steichen Kinnard, Inc. ("**MJSK**"),
hereinafter referred to as "**Claimant**" or "**Counter-Respondent**" was represented by
Joseph W. Anthony, Esq., and Steven M. Phillips, Esq., of Anthony Ostlund & Baer,
P.A., Minneapolis, Minnesota.

Northland Securities, Inc. ("**Northland**"), Thomas Bartzen ("**Bartzen**"), Mark Beese
("**Beese**"), Steven Mattson ("**Mattson**"), J. Patrick Maloney III ("**Maloney**"), Richard
Reynolds ("**Reynolds**"), Seth Kahn ("**Kahn**"), Brian Kujawa ("**Kujawa**"), Paul Donna
("**Donna**") Steven Gapinski ("**Gapinski**"), Gracia Butwin ("**Butwin**"), Nicholas Skarich

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

("**Skarich**"), Ryan McEnerney ("**McEnerney**"), Bryan Johnson ("**Bryan Johnson**"), Cyndy Litke ("**Litke**") and Gary Nelson ("**Nelson**"), hereinafter referred to as "**Respondents**," were represented by Thomas B. Hatch, Esq., Stacey P. Slaughter, Esq., and Bruce Manning, Esq., of Robins, Kaplan, Miller & Ciresi, L.L.P., Minneapolis, Minnesota.

Eldon Miller ("**Eldon Miller**"), David Johnson ("**David Johnson**"), Todd Miller ("**Todd Miller**") Jeffrey Houdek ("**Houdek**"), Michael Martson ("**Martson**"), Kristi Lefferts ("**Lefferts**") and Jeffrey Olson ("**Olson**"), hereinafter referred to as "**Third-Party Respondents**," were represented by Joseph W. Anthony, Esq., and Steven M. Phillips, Esq., of Anthony Ostlund & Baer, P.A., Minneapolis, Minnesota.

**\*2 CASE INFORMATION**: The Statement of Claim was filed on or about November 7, 2002. The Submission Agreement of Claimant was signed on or about November 7, 2002, by David Johnson of Miller Johnson Steichen Kinnard, Inc.

A Joint Statement of Answer was filed by Respondents, Northland Securities, Inc., Thomas Bartzen, Mark Beese, Steven Mattson, J. Patrick Maloney, III, Richard Reynolds, Seth Kahn, Brian Kujawa, Paul Donna, Steven Gapinski, Gracia Butwin, Nicholas Skarich, Ryan McEnerney, Bryan Johnson, Cyndy Litke and Gary Nelson, on or about January 13, 2003. The Submission Agreement of Respondent, Northland Securities, Inc., was signed on or about January 13, 2003. The Submission Agreement of Respondent, Thomas Bartzen, was signed on or about January 13, 2003. The Submission Agreement of Respondent, Mark Beese, was signed on or about January 13, 2003. The Submission Agreement of Respondent, Steven Mattson, was signed on or about January 13, 2003. The Submission Agreement of Respondent, J. Patrick Maloney III, was signed on or about January 13, 2003. The Submission Agreement of Respondent, Richard Reynolds, was signed on or about January 13, 2003. The Submission Agreement of Respondent, Seth Kahn, was signed on or about January 13, 2003. The Submission Agreement of Respondent, Brian Kujawa, was signed on or about January 13, 2003. The Submission Agreement of Respondent, Paul Donna, was signed on or about January 13, 2003. The Submission Agreement of Respondent, Steven Gapinski, was signed on or about January 13, 2003. The Submission Agreement of Respondent, Gracia Butwin, was signed on or about January 16, 2003. The Submission Agreement of Respondent, Nicholas Skarich, was signed on or about January 13, 2003. The Submission Agreement of Respondent, Bryan Johnson, was signed on or about January 13, 2003. The Submission Agreement of Respondent, Cyndy Litke, was signed on or about January 13, 2003. The Submission Agreement of Respondent, Gary Nelson, was signed on or about January 13, 2003.

A Counterclaim and Third-Party Claim were filed jointly by Northland Securities, Inc., Thomas Bartzen, Mark Beese, Steven Mattson, J. Patrick Maloney III, Richard Reynolds, Seth Kahn, Paul Donna, Nicholas Skarich and Gary Nelson, hereinafter referred to as, "Counter-Claimants" or "Third-Party Claimants," on or about January 13, 2003.

Claimant filed a Reply to the Counterclaim on or about January 23, 2003.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2004 WL 2191746 (N.A.S.D.)                                        Page 3

Respondents filed an Amended Answer on or about January 28, 2003.

Third-Party Claimants filed an Amended Counterclaim and Third-Party Claim on or about January 28, 2003.

Claimant filed a Reply to Third-Party Claimants' Amended Counterclaim on or about March 14, 2003.

Third-Party Respondents filed an Answer to the Third-Party Claims on or about March 14, 2003.

Claimant filed a further Reply to Respondents' Amended Counterclaim on or about May 17, 2003.

Third-Party Respondents filed an Amended Answer to Third-Party Claim on or about May 17, 2003

*3 Claimant filed a Motion to Amend and Amended Statement of Claim on or about June 25, 2003.

Respondents filed a Second Amended Answer on or about July 24, 2003.

Third-Party Claimants filed an Amended Counterclaim and Third-Party Claim on or about July 24, 2003.

Kahn filed a Motion to Amend the Amended Counterclaim and Third-Party Claim on or about August 8, 2003.

Kahn filed a Motion for Sanctions and Attorney's Fees on or about August 8, 2003.

Claimant filed a Memorandum in Opposition to Kahn's Motion for Sanctions and Attorney's Fees on or about August 12, 2003.

Claimant and Third-Party Respondents filed a Memorandum in Opposition to Respondent Kahn's

Motion to Amend Counterclaim and Third-Party Claim on or about August 12, 2003.

Respondent Kahn filed a Reply to the Motion for Sanctions and Attorney's Fees on or about August 27, 2003.

Respondent Kahn filed a Reply to the Motion to Amend Counterclaim and Third-Party Claim on or about September 17, 2003.

**CASE SUMMARY**: Claimant asserted causes of action including the following: violation of NASD Conduct Rules, breach of fiduciary duty, breach of employment agreements, tortious interference with business relationship, and unfair competition. The causes of action related to Claimant's allegation that

Respondent Northland solicited the departure of over 50 MJSK employees, the vast

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2004 WL 2191746 (N.A.S.D.)                                              Page 4

majority of whom were employed at MJSK's profitable Fixed Income Department.
Claimant asserted that Respondents transmitted MJSK's confidential customer
information and trade secret information to Northland and used this information to
solicit MJSK's customers and employees. Claimant asserted that Respondents'
actions constituted raiding, that Respondents violated their employment agreements
upon their departure and that MJSK is due monies loaned to Respondents.

Respondents denied the allegations set forth in the Statement of Claim and
asserted affirmative defenses including the following: Claimant failed to state a
claim upon which relief can be granted; Claimant's claims are barred by estoppel,
waiver, and unclean hands; the Employment Agreements of Respondents Nelson and
Kahn are void because they were induced by fraud; the notes signed by Kahn and
Gapinski are void because they were procured by fraud; and all of the non-compete
agreements are contrary to public policy and not reasonably tailored to protect a
legitimate interest of MJSK, and are therefore void.

In their Counterclaim and Third-Party Claim, Third-Party Claimants asserted causes
of action including the following: violations of NASD Rule 2110, breach of
contract, violations of Minn. Stat. § 181.14, intentional interference with
prospective business advantage, and conversion. The causes of action related to
Third-Party Claimants' allegation that MJSK and Third-Party Respondents did not
engage in any oversight activities or supervision of the stock loan department of
MJK Clearing and as a result, Third-Party Claimants' ability to earn a living was
jeopardized because customers refused to do business with them due to the
customers' concerns about the integrity and stability of MJSK. Third-Party
Claimants also asserted that MJSK breached terms of their contracts including
unpaid commissions, underwriting fees and lost opportunity to earn non-
discretionary bonuses.

*4 Claimant and Third-Party Respondents denied the allegations set forth in the
Counterclaim and Third-Party Claim and asserted affirmative defenses including the
following: Counter-Claimants have failed to state claims upon which relief may be
granted; the claims asserted by Counter-Claimants are barred by the doctrines of
estoppel, waiver, offset and unclean hands; the claims asserted by Counter-
Claimants are barred by the doctrine of in *pari delicto*; and the claims asserted
by Counter-Claimants are barred by the parol evidence rule.

**RELIEF REQUESTED:** Claimant requested an award in the amount of $30,000,000 in
compensatory damages, plus punitive damages, costs, interest, attorney's fees and
any other relief that the panel deemed just and equitable. In addition, Claimant
requested "a permanent injunction prohibiting Northland, its employees, agents and
representatives from having any contact with any employee of MJSK in any way
connected to hiring or considering hiring of such employees, for a period of one
year, and prohibiting Northland from actually hiring any employees from MJSK, for
a period of one year." Claimant also requested compensation from Respondents
Bartzen, Butwin, Donna, Gapinski, Kahn, Kujawa, Litke, Mattson, McEnerney, Morse
and Skarich, for breaches of their promissory notes in the amounts of the unpaid

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2004 WL 2191746 (N.A.S.D.)                                             Page 5

principal and interest, costs and attorneys' fees.

Respondents requested that the claims asserted against them be denied and dismissed in their entirety and that they be awarded their costs and attorneys' fees. In the Counterclaim and Third-Party Claim, Third-Party Claimants requested in excess of $5,000,000 in compensatory damages, plus attorneys' fees and an injunction against MJSK and its agents from making false statements about Northland and its employees. In addition, Third-Party Claimants requested an injunction compelling MJSK to pay the 5% year-end override to Respondents Bartzen, Kujawa and Butwin in April 2003, and to distribute the Juran & Moody Fiscal Poll to the individuals in the amounts specified in Mr. Mattson's letter dated November 22, 2002. Third-Party Claimants Bartzen, Mattson, Beese, Reynolds and Maloney also requested an injunction compelling MJSK to restore the Stockwalk shareholdings back into their accounts.

In Third-Party Claimants' Amended Counterclaim and Third-Party Claim dated July 24, 2003, Third-Party Claimant Kahn requested unspecified monetary damages, plus an Order requiring MJSK to rescind the transactions involving Kahn.

Claimant and Third-Party Respondents requested that the claims asserted against them in the Third-Party Claimants' Amended Counterclaim and Third-Party Claim be denied and dismissed in their entirety and that they be awarded their costs and attorneys' fees in addition to the relief requested in the Statement of Claim.

**OTHER ISSUES CONSIDERED & DECIDED**: Respondent Ryan McEnerney did not file with NASD Dispute Resolution a properly executed Uniform Submission Agreement but is required to submit to arbitration pursuant to the Code, and having answered the claim is bound by the determination of the panel on all issues submitted.

**\*5** Third-Party Respondents, Eldon Miller, David Johnson, Todd Miller, Jeffrey Houdek, Michael Martson, Kristi Lefferts and Jeffrey Olson, did not file with NASD Dispute Resolution properly executed Uniform Submission Agreements but are required to submit to arbitration pursuant to the Code and, having answered the Third-Party claims and appeared at the hearing, are bound by the determination of the panel on all issues submitted.

The panel granted the Motions to Amend the parties' respective pleadings and deemed them filed during the initial pre-hearing conference call on November 19, 2003.

The panel entered an Order on or about April 12, 2004, granting Third-Party Claimants' Motion to Amend their Counterclaim and Third-Party Claim. In addition, in the April 12, 2004, Order, the panel deferred ruling on Respondent's Kahn Motion for Sanctions and Attorney's Fees.

On or about May 19, 2003, the parties submitted a stipulation to dismiss all claims asserted against Respondent Ryan McEnerney. The panel did not adjudicate any claims asserted against Respondent McEnerney.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2004 WL 2191746 (N.A.S.D.)                                                                        Page 6

On or about July 26, 2004, the parties submitted the following stipulation:

"All claims of Claimant MJSK asserted against Respondents J. Patrick Maloney, Paul Donna, Nicholas Skarich, Bryan Johnson and Gary Nelson and hereby voluntarily dismissed, with prejudice, and as to these claims, each party will bear its or his own attorneys fees and costs;

All claims of each and every Counterclaimant and Third-Party Claimant against Third-Party Respondents Michael Marston, Kristi Lefferts and Jeffrey Olson are hereby voluntarily dismissed, with prejudice, and as to these claims, each party will bear its, his, or her own attorneys' fees and costs; and

All claims of J. Patrick Maloney, Paul Donna, Nicholas Skarich, Bryan Johnson and Gary Neslon against Counterclaim Respondents and/or Third Party Respondents MJSK, Eldon Miller, David Johnson, Todd Miller and Jeffrey Houdek are hereby voluntarily dismissed, with prejudice, and as to these claims each party will bear its or his own attorneys' fees and costs."

Respondent Bryan Johnson was not entered as a Claimant in any claims filed.

The parties have agreed that the Award in this matter may be executed in counterpart copies or that a handwritten, signed Award may be entered. In either case, the parties have agreed to receive conformed copies of the award while the originals remain on file with NASD Dispute Resolution ("NASD").

**AWARD**: After considering the pleadings, the testimony, and the evidence presented at the hearing, the undersigned arbitrators have decided in full and final resolution of the issues submitted for determination as follows:

1. Respondents, Northland Securities, Thomas Bartzen, Mark Beese, Steven Mattson and Richard Reynolds are jointly and severally liable for and shall pay to Claimant, Miller Johnson Steichen Kinnard, Inc., the sum of Ten Million Dollars and No Cents ($10,000,000.00) in compensatory damages;

*6 2. Respondent, Steven Mattson, is solely liable for and shall pay to Claimant, Miller Johnson Steichen Kinnard, Inc., the sum of Sixty Thousand Dollars and No Cents ($60,000.00) in damages on the breach of employment contract claim;

3. Respondent, Seth Kahn, is solely liable for and shall pay to Claimant Miller Johnson Steichen Kinnard, Inc., the sum of Twenty Three Thousand Thirty Five Dollars and No Cents ($23,035.00) in damages on the breach of employment contract claim;

4. Claimant's claims against Respondents Brian Kujawa, Steven Gapinski, Gracia Butwin, Bryan Johnson, and Cyndy Litke are denied and dismissed with prejudice in their entirety;

5. Claimant, Miller Johnson Steichen Kinnard, Inc., is solely liable for and shall pay to Respondent, Steven Mattson, the sum of Thirty Four Thousand Three Hundred

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2004 WL 2191746 (N.A.S.D.)                                                     Page 7


Eighty Two Dollars and Eighty Five Cents ($34,382.85) in damages on unpaid commissions earned;

6. Respondent Mattson's counterclaim for conversion of stock certificates is denied. Respondent Mattson is directed to the lost certificate procedures to recover the stock certificates;

7. Counter-Claimants, Northland, Bartzen, Beese, Reynolds and Kahn's claims, each and all, are denied and dismissed with prejudice in their entirety;

8. All remaining Third-Party claims, each and all, are denied and dismissed with prejudice in their entirety;

9. To the extent not specifically awarded or otherwise provided for above, all other claims and requests for relief by any party hereto, including punitive damages and injunction requests, are denied with prejudice; and

10. Other than the Forum Fees noted below, the parties shall each bear all other costs and expenses incurred by them in connection with this proceeding, including but not limited to attorneys' fees.

**FEES**: Pursuant to the Code, the following fees are assessed:

**Filing Fees**: NASD Dispute Resolution will retain the non-refundable filing fees for each claim:

| | |
|---|---|
| Initial claim filing fee = | $ 5,000.00 |
| Counterclaim/Third-Party claim filing fee = | $ 2,500.00 |

**Member Fees**: Member fees are assessed to each member firm that is a party in these proceedings or to the member firm that employed the associated person at the time of the events giving rise to the dispute. In this matter, the member firms are Miller Johnson Steichen Kinnard, Inc. and Northland Securities, Inc.

| | |
|---|---|
| Member surcharge = | $ 3,750.00 |
| Pre-hearing process fee = | $ 750.00 |
| Hearing process fee = | $ 5,500.00 |

**Forum Fees and Assessments**: The Arbitration Panel assesses forum fees for each hearing session conducted. A hearing session is any meeting between the parties and the arbitrator(s), including a pre-hearing conference with the arbitrator(s), that lasts four (4) hours or less. Fees associated with these proceedings are:

| | | | |
|---|---|---|---|
| Five (5) Pre-hearing sessions with Chairperson x $ 450.00 | | | = $ 2,250.00 |
| Pre-hearing conferences: | 12/10/2003 | 1 session | |
| | 01/06/2004 | 1 session | |
| | 05/11/2004 | 1 session | |
| | 06/15/2004 | 1 session | |
| | 07/09/2004 | 1 session | |

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2004 WL 2191746 (N.A.S.D.) 

Page 8

| | | | |
|---|---|---|---|
| Two (2) Pre-hearing sessions with Panel x $ 1,200.00 | | | = $ 2,400.00 |
| Pre-hearing conferences: | 11/19/2003 | 1 session | |
| | 04/08/2004 | 1 session | |
| Twenty Four (24) Hearing sessions with Panel x $ 1,200.00 | | | = $ 28,800.00 |
| Hearing Dates: | 07/19/2004 | 2 sessions | |
| | 07/20/2004 | 2 sessions | |
| | 07/21/2004 | 2 sessions | |
| | 07/22/2004 | 2 sessions | |
| | 07/23/2004 | 2 sessions | |
| | 07/26/2004 | 2 sessions | |
| | 07/27/2004 | 2 sessions | |
| | 07/28/2004 | 2 sessions | |
| | 07/29/2004 | 2 sessions | |
| | 07/30/2004 | 2 sessions | |
| | 08/05/2004 | 2 sessions | |
| | 08/06/2004 | 2 sessions | |
| Total Forum Fees | | | = $ 33,450.00 |

*7 The Arbitration Panel has assessed $ 16,725.00 of the forum fees, jointly and severally to Miller Johnson Steichen Kinnard, Inc. and Eldon Miller, David Johnson, Todd Miller, Jeffrey Houdek.

The Arbitration Panel has assessed $ 16,725.00 of the forum fees jointly and severally to Northland Securities, Thomas Bartzen, Mark Beese, Steven Mattson, Richard Reynolds and Seth Kahn.

**Fee Summary**: Claimant, Miller Johnson Steichen Kinnard, Inc. is liable for:

| | |
|---|---|
| Initial Filing Fee = | $ 5,000.00 |
| Member Fees = | $ 10,000.00 |
| Total Fees = | $ 15,000.00 |
| Less payments = | $ 15,000.00 |
| Balance Due NASD Dispute Resolution = | $ 0.00 |

Respondent, Northland Securities, Inc., is liable for:

| | |
|---|---|
| Member Fees = | $ 10,000.00 |
| Total Fees = | $ 10,000.00 |
| Less payments = | $ 10,000.00 |
| Balance Due NASD Dispute Resolution = | $ 0.00 |

Claimant, Miller Johnson Steichen Kinnard, Inc., and Third-Party Respondents, Eldon Miller, David Johnson, Todd Miller, Jeffrey Houdek, are jointly and severally liable for:

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2004 WL 2191746 (N.A.S.D.)                                                    Page 9

| | |
|---|---|
| Forum Fees = | $ 16,725.00 |
| Total Fees = | $ 16,725.00 |
| Less payments = | $ 1,200.00 |
| Balance Due NASD Dispute Resolution = | $ 15,525.00 |

Counter-Claimant, Northland Securities, Inc., and Third-Party Claimants, Thomas Bartzen, Mark Beese, Steven Mattson, Richard Reynolds, and Seth Kahn, are jointly and severally liable for:

| | |
|---|---|
| Counterclaim/Third-Party Claim Filing Fee = | $ 2,500.00 |
| Forum Fees = | $ 16,725.00 |
| Total Fees = | $ 19,225.00 |
| Less payments = | $ 3,700.00 |
| Balance Due NASD Dispute Resolution = | $15,525.00 |

**\*8 All balances are payable to NASD Dispute Resolution and are due upon receipt pursuant to Rule 10330(g) of the Code of Arbitration**

**ARBITRATION PANEL**: Richard A. Mosman, Esq.-Public Arbitrator, Presiding Chair

James A. Lundberg, Esq.-Public Arbitrator

Guy S. Sasanfar-Non-Public Arbitrator

Concurring Arbitrators:

Richard A. Mosman, Esq.
Public Arbitrator, Presiding Chair

James A. Lundberg, Esq.
Public Arbitrator

Guy S. Sasanfar
Non-Public Arbitrator

2004 WL 2191746 (N.A.S.D.)
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in N.W.2d                                              Page 1
Not Reported in N.W.2d, 2005 WL 1953199 (Minn.Dist.Ct.)
**(Cite as: Not Reported in N.W.2d)**

Miller Johnson Steichen Kinnard, Inc. v. Northland
Securities, Inc.
Minn.Dist.Ct.,2005.
Only the Westlaw citation is currently available.
District Court of Minnesota, Fourth Judicial
District, Hennepin County.
**MILLERJOHNSONSTEICHENKINNARD,
INC.**, Plaintiff-Claimant,
v.
NORTHLAND SECURITIES, INC., Thomas
Bartzen, Mark Beese, Steven Mattson, and Richard
Reynolds, Defendants-Respondents.
No. MC 04-014441.

Jan. 27, 2005.

ORDER
ROSENBAUM, J.
*1 The above-entitled matter came on before the
Honorable Marilyn Brown Rosenbaum on
December 14, 2004, pursuant to Plaintiff-
Claimant's Motion to Confirm Arbitration Award
and Defendants-Respondents' Motion to Vacate or
Modify Arbitration Award.

Joseph W. Anthony, Esq. and Steven M. Phillips,
Esq. appeared on behalf of Plaintiff-Claimant.

Louis A. Remele, Jr., Esq. and Christopher R.
Morris, Esq., appeared on behalf of Defendants-
Respondents, Northland Securities, Inc., Thomas
Bartzen, Mark Beese, Steven Mattson, and Richard
Reynolds.

Based upon the files, records, and proceedings
herein, the arguments of counsel, and being fully
informed in the premises, the Court makes the
following:

ORDER

1. Defendants-Respondents' Motion to Vacate or
Modify the Arbitration Award, dated September 15,
2004, is denied.

2. Plaintiff-Claimant's Motion to Confirm the

Arbitration Award, dated September 15, 2004, is
granted.

3. The award of the National Association of
Securities Dealers, Inc., dated September 15, 2004,
is confirmed and judgment shall be entered in
conformity with the award.

4. Plaintiff-Claimant's Motion for post-award
interest is granted at the applicable statutory
interest rate, for the period September 15, 2004
until each remaining portion of the award and
judgment is paid in full.

5. Plaintiff-Claimant's Motion for an award of costs
and disbursements incurred in the application and
proceedings subsequent thereto is granted pursuant
to Minn.Stat. § 572.21. Plaintiff-Claimant shall file
an affidavit in support of such costs and
disbursements within fourteen (14) days of the date
this Order. Defendants-Respondents shall file any
objections fourteen (14) days thereafter.

6. The attached Memorandum is incorporated herein.

LET JUDGMENT BE ENTERED ACCORDINGLY

MEMORANDUM

The facts are not in dispute. On November 7, 2002
Miller Johnson Steichen Kinnard, Inc. ("MJSK")
commenced a National Association of Securities
Dealers Inc. ("NASD") arbitration against
Defendant Northland Securities Inc. ("Northland")
and the individual Defendants. The events that led
to the NASD arbitration were presented to the
appointed panel of arbitrators. On September 15,
2004, after twelve days of hearings, on September
15, 2004, the arbitrators awarded MJSK damages,
joint and severally, against Northland and the
individual Defendants. Defendants then petitioned
for a modification or reduction of the award which
was denied. Defendants now seek the vacation of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d
Not Reported in N.W.2d, 2005 WL 1953199 (Minn.Dist.Ct.)
(Cite as: Not Reported in N.W.2d)

the arbitration award while Plaintiff moves for confirmation.

Plaintiff relies on Minnesota law and policy favoring arbitration and upon the narrow standard of review imposed upon the Court.

Defendants argue that the award violates Minnesota public policy concerning the right of individuals to find work to compete, and impose an undue penalty upon Defendants for leaving MJSK and competing with MJSK. Defendants also argue that because the corporate raiding theory was raised during the hearings and was possibly a basis for the award and since the panel did not explain the basis of the award, the award violates public policy. In the alternative, Defendants ask the Court to remand the case for consideration as to what, if any, damages would be appropriate if a corporate raiding theory is not considered.

**\*2** "There is a strong policy in Minnesota favoring arbitration, and judicial intervention has been carefully circumscribed."*Beebout v. St. Paul Fire & Marine Ins. Co.,* 365 N.W.2d 271, 273 (Minn.Ct.App.1985). There is also a strong national policy favoring arbitration and recognizing the limited role of Court reviews under a narrow set of statutory circumstances. *SeeDVC-JPW Investors v. Gershman,* 5 F.3d 1172, 1174 (8th Cir.1993). Court review of the arbitration process is "extremely limited." *Kiernan v. Piper Jaffray Cos., Inc.,* 137 F.3d 588, 594 (8th Cir.1998).

MJSK and Northland, as NASD member firms, voluntarily agreed to resolve any disputes between them pursuant to well-defined rules of the NASD as contained in its Code of Arbitration Procedure. The individual Defendants, as "persons associated with a [NASD] member" have the same duties and obligations of a member firm. *See* NASD Rule 0115. These parties have bargained away their right to a judicial determination of their dispute, in exchange for a speedy, inexpensive, and private determination. "Arbitration provides neither the procedural protections nor the assurance of the proper application of substantive law offered by the

judicial system ."*Card v. Stratton Oakmont, Inc.,* 933 F.Supp. 806, 814 (D.Minn.1996). However, arbitration is an agreed upon way for the parties to avoid the Courts and to enter into a structure to resolve their specialized disputes before qualified arbitrators who understand the unique customs of the industry at hand. In exchange, the parties relinquish appeals and review in favor of final and binding decisions.

Pursuant to the Minnesota Arbitration Act, Minn.Stat. § 572.19, the Court shall vacate an award if:
(1) The award was procured by corruption, fraud or other undue means; (2) There was evident partiality by an arbitrator appointed as a neutral or corruption in any of the arbitrators or misconduct prejudicing the rights of any party; (3) The arbitrators exceded their powers; (4) The arbitrators refused to postpone the hearing upon sufficient cause being shown therefor refused to hear evidence material to the controversy or otherwise so conducted the hearing, contrary to the provisions of section 572.12, as to prejudice substantially the rights of a party; or (5) There was no arbitration agreement and the issue was not adversely determined in proceedings under section 572.09 and the party did not participate in the arbitration hearing without raising the objection ...

None of the grounds allowed under the statute exist here, nor were they argued by Defendants to have existed. Therefore, each ground will not be separately addressed herein. Any speculation by Defendants as to the grounds for the award must be disregarded. So too, must characterization of the award as punitive.

Defendants premise their argument solely upon the allegation that the award violates public policy. The public policy exception is only rarely raised or sustained. Minnesota cases apply only in the area of public employee collective bargaining agreements and even then only under unique circumstances. *SeeCity of Brooklyn Center v. Law Enforcement Labor Services., Inc.,* 635 N.W.2d 236, 241 (Minn.Ct.App.2001). The facts here do not support

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d
Not Reported in N.W.2d, 2005 WL 1953199 (Minn.Dist.Ct.)
**(Cite as: Not Reported in N.W.2d)**

a public policy exception and this Court cannot adopt such a standard, which has no precedence under Minnesota law or statute and cannot extend the law to include NASD arbitration proceedings.

Minn.Dist.Ct.,2005.
Miller Johnson Steichen Kinnard, Inc. v. Northland Securities, Inc.
Not Reported in N.W.2d, 2005 WL 1953199 (Minn.Dist.Ct.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 3**

Copy mailed to attorneys for
parties by the Court pursuant
to Rule 77 (d) Federal Rules of
Civil Procedures.

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

U.S. DIST. COURT EAST DIST. WISC.
FILED

MAR 10 2003

AT _____ O'CLOCK _____ M
SOFRON B. NEDILSKY

THE PRUDENTIAL INSURANCE COMPANY
OF AMERICA and PRUCO SECURITIES
CORPORATION,

        Plaintiffs,

v.

PAUL TOURVILLE, PETER TOURVILLE,
BRENT LANDOWSKI, JOHN JONAS, and
BRIAN PETERSEN, and DOES
1 through 10, Inclusive,

        Defendants.

Case No. 03-C-0135

## DECISION AND ORDER

Plaintiffs are the Prudential Insurance Company of America and Pruco Securities Corporation (collectively, "Prudential"). Defendants are former Prudential Insurance agents. Prudential charges that defendants have violated employment contracts containing restrictive covenants by (1) improperly soliciting their former Prudential customers, (2) improperly soliciting their former Prudential colleagues and (3) improperly using Prudential's confidential, proprietary and/or trade secret information. This matter comes before me on plaintiffs' motion for a preliminary injunction. I held a hearing on this matter on February 24, 2003.

## I. BACKGROUND

The facts of this case are not in dispute. Defendants sold and serviced life insurance policies and annuity contracts in Prudential's MIL6 Agency, which serves southeastern Wisconsin. Paul Tourville departed Prudential's MIL6 Agency on

December 26, 2002, Petersen departed on January 3, 2003 and the remaining named defendants resigned on January 23 and 24, 2003. All defendants subsequently took similar employment with a Prudential competitor, Metropolitan Life Insurance Company and MetLife Securities, Inc. (collectively, "MetLife"), in one of its Milwaukee, Wisconsin offices. Defendants are presently soliciting business from their former Prudential customers, soliciting other Prudential personnel to leave employment with Prudential and allegedly misappropriating Prudential trade secrets.

All defendants entered into at least one agreement with Prudential in the course of their employment there. As Prudential agents, defendants Petersen, Landowski and Peter Tourville entered into Statutory Agent Agreements with Prudential. These Agreements contain a number of sections relevant to this action. Section 6 of the Agent Agreements states that all information concerning Prudential's customers and the business of Prudential are "unique, extremely valuable to Prudential and acquired by great expenditures of time, effort and cost," which remain the sole and exclusive property of Prudential.

Section 7 of the Agent Agreement provides:

Upon termination of your association with the Company, from any capacity, you agree that for a period of two years following the date of such termination, you will not, directly or indirectly, as to any product/service of the type issued or marketed by the Company:

(1) solicit from or attempt to solicit from; or
(2) sell to or attempt to sell to

any person, company or organization that was sold to or serviced by any agency to which you were assigned, to whom you sold, for whom you

2

were named Agent of Record or servicing representative on any product/service issued or marketed by the Company, with whom you had contact, or whom you serviced, during the course of your association with the Company in any capacity.

Also in section 7 of the Agent Agreement is a restrictive covenant regarding solicitation of Prudential personnel:

> You also agree, during your association with the Company, in any capacity, and for a period of two years after the termination of your association with the Company, that you will not induce or attempt to induce any person associated with, or under contract with, the Company to terminate, and that you will not otherwise facilitate the termination by any such person of, his/her relationship with the Company. You also agree, during the same time period, that you will not induce or attempt to induce any such person to sell or solicit products/services on behalf of any other company which are in any way similar to those sold by the Company, and that you will not otherwise facilitate such conduct.

The Agent Agreements provide in Section 11 that Agents consent "to the issuance of a temporary restraining order or a preliminary injunction by any court or agency with jurisdiction over you to prohibit your breach of any provision of this Agreement, or to maintain the status quo pending the outcome of any arbitration and/or litigation proceeding."

Defendant Jonas entered into a Financial Services Associate Agreement and defendant Paul Tourville entered into a severance agreement with Prudential, both of which contained restrictive covenants similar in material respects to the Agent Agreements described above.

Prudential alleges that as of December 31, 2002, the face amount of the Prudential life insurance policies and annuity contracts in the Prudential books of

From: Robert b. Corris  414-27,2-8888  To: Anthony. Paduano            Date: 3/10/2003  Time: 1:04:06 PM                    Page 6 of 20

'03/10/03   13:58 FAX 414 297 1296          JUDGE ADELMAN                                    ☑005

business formerly serviced by defendants was in excess of $81 million.   This encompassed in excess of 2,200 life insurance policies and annuity and other contracts.   There were also mutual funds in the books of business serviced by defendants at Prudential totaling in excess of $18 million of invested assets.

Prudential alleges that defendants have solicited and already diverted Prudential contracts and mutual fund accounts to MetLife as well as having successfully solicited three former colleagues from Prudential to join them at MetLife.  Prudential seeks to preliminarily enjoin defendants' solicitations until an arbitration panel convened by NASD Dispute Resolution, Inc. can issue a decision on the merits.

## II. JURISDICTION

### A. Subject Matter Jurisdiction

I have subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), in that Prudential and the defendants are citizens of different states and the amount in controversy exceeds $75,000.

### B. Personal Jurisdiction

I will briefly address my personal jurisdiction over the unnamed, or John Doe, defendants.  These defendants are identified in the complaint as "Does 1 through 10, inclusive."  These unnamed defendants are described as being believed to be "the partners, agents, or principals of the named defendants and each other."

The use of fictitious names is disfavored and, while exceptions to the rule can be made where justified, a district court judge has an independent duty to determine

whether exceptional circumstances justify such a departure from the normal method of proceeding in federal courts.  <u>Doe v. Blue Cross & Blue Shield United of Wis.</u>, 112 F.3d 869, 872 (7th Cir. 1997); <u>see also</u> Fed. R. Civ. P. 10(a), providing that the complaint shall give the names of all parties to the suit.  Whether to permit the use of fictitious names for parties is left to the discretion of the district court.  <u>K.F.P. v. Dane County</u>, 110 F.3d 516, 519 (7th Cir. 1997).

In the present case plaintiffs have not asked permission to proceed with anonymous defendants and have made no attempt to justify doing so.  Nor am I aware of the presence of any exceptional circumstances that would justify departing from the normal method of proceeding.  Therefore, all John Doe defendants will be dismissed as parties.

### III. APPLICABLE SUBSTANTIVE LAW

Defendants contend that Prudential cannot succeed on the merits because Wisconsin law applies and the restrictive covenants at issue are unenforceable under Wisconsin law.  Prudential argues that Wisconsin law does not apply because the relevant agreements include a choice of law provision specifying that New Jersey law controls.

Where the laws of more than one state arguably apply, a federal court must apply the choice of law rules of the state in which it sits.  <u>Klaxon Co. v. Stentor Elec. Mfg. Co.</u>, 313 U.S. 487, 496-97 (1941).  Thus, I will apply Wisconsin choice of law rules.

5

Wisconsin recognizes that parties to a contract may expressly agree that the law of a certain jurisdiction shall govern issues arising under the contract. <u>Jefferis v. Kanawha Fuel Co.</u>, 182 Wis. 203, 205 (1923). However, Wisconsin precludes parties from making such agreements at the expense of important public policies of a state whose law would apply in the absence of such agreement. <u>Bush v. Nat'l Sch. Studios, Inc.</u>, 139 Wis. 2d 635, 642 (1987).

New Jersey law allows a court to enforce an otherwise invalid restrictive covenant to the extent such terms can be made reasonable. <u>Karlin v. Weinberg</u>, 390 A.2d 1161, 1168 n.4 (N.J. 1978) ("It is well settled [in New Jersey] that restrictive covenants in employment contracts which fail to include reasonable geographical or temporal restrictions are partially enforceable to the extent they are reasonable under the circumstances.") In contrast, Wis. Stat. § 103.465 prohibits Wisconsin courts from "giv[ing] effect to an overall unreasonable covenant to the extent some portions thereof might be considered reasonable." <u>Gen. Med. Corp. v. Kobs</u>, 179 Wis. 2d 422, 431 (Wis. Ct. App. 1993).

Defendants argue that New Jersey's policy allowing courts to extract or modify unenforceable provisions from restrictive covenants and otherwise allow them to stand offends Wisconsin's public policy of making an entire non-compete void if any provision of it is unenforceable. I agree. Wisconsin courts consider that other states' willingness to sever contract provisions to make non-competes reasonable "contravene[s] a fundamental policy of the law of Wisconsin" and will therefore not enforce choice of

6

law provisions for states which allow severance.  Id. at 432 (refusing to enforce a choice of law provision in a contract that designated Virginia law to apply where Virginia allowed courts to give partial effect to restrictive covenants which were in other parts unreasonable).  Therefore, Wisconsin substantive law applies.

## IV.  DISCUSSION

### A. Legal Standard

A preliminary injunction is warranted if the party seeking the injunction can make a threshold showing that: (1) the case has a reasonable likelihood of success on the merits; (2) no adequate remedy at law exists; (3) it will suffer irreparable harm if the injunction is not granted; (4) the balance of hardships is in favor of the moving party; and (5) the preliminary injunction will not harm the public interest.  Rust Env't & Infrastructure, Inc. v. Teunissen, 131 F.3d 1210, 1213 (7th Cir. 1997).  Factors one and three are related under the Seventh Circuit's 'sliding scale' approach.  Farmers Ins. Exch. v. Sorenson, 99 F. Supp. 2d 1000, 1004 (E.D. Wis. 2000).  "[T]he more likely it is the plaintiff will succeed on the merits, the less the balance of irreparable harms need weigh towards its side; the less likely it is the plaintiff will succeed, the more the balance need weigh towards its side."  Abbott Labs. v. Mead Johnson & Co., 971 F.2d 6, 11 (7th Cir. 1992).

I will first examine Prudential's likelihood of success on the merits, analyzing each of its claims in turn.  I will then more briefly analyze the other four threshold

factors for determining whether a preliminary injunction should issue.[1]

## B. Likelihood of Success on the Merits

As indicated, Prudential claims that defendants are violating the restrictive covenants they signed as a part of their Prudential employment by (1) improperly soliciting their former Prudential customers, (2) improperly soliciting their former Prudential colleagues to join them at MetLife and (3) improperly using Prudential's confidential, proprietary and/or trade secret information. Defendants raise no factual dispute regarding their alleged conduct. Instead, and for a variety of reasons, defendants claim that Prudential cannot prevail because the covenants at issue are unenforceable.

### 1.   Enforceability of Covenants Not To Compete

Wisconsin's statute regarding restrictive covenants provides as follows:

---

[1] Before beginning this analysis, I will briefly address defendants' argument that because plaintiffs' complaint and motion are based largely on "information and belief," they are not sufficient to support the grant of injunctive relief. Defendants' argument is fatally undercut by the fact that at oral argument defendants conceded that they were doing what the plaintiffs alleged ~~and instead argued that they were legally entitled to do so~~. Besides, hearsay can be considered in entering a preliminary injunction. S.E.C. v. Cherif, 933 F.2d 403, 412 n.8 (7th Cir. 1991) (citing Asseo v. Pan Am. Grain Co., 805 F.2d 23, 26 (1st Cir.1986)); see also Alexander & Alexander, Inc. v. Danahy, 488 N.E.2d 22, 27 (Mass. App. Ct. 1986) ("That the allegations of widespread violations of the covenants by [former employee] were based only on information and belief in these circumstances ought not to defeat [former employer's] right to preliminary injunctive relief. One would not expect [former employer's] official to possess extensive direct personal knowledge of those facts. Moreover, the purpose of the injunction is to prevent whatever future violations are likely to occur.").

From: Robert B. Corris   414-272-8050   To: Anthony Paduano          Date: 3/10/2003 Time: 1:04:06 PM          Page 11 of 20

03/10/03   13:58 FAX 414 297 1296          JUDGE ADELMAN          @010

> A covenant by an . . . agent not to compete with his or her employer or principal during the term of the employment or agency, or after the termination of that employment or agency, within a specified territory and during a specified time is lawful and enforceable only if the restrictions imposed are reasonably necessary for the protection of the employer or principal. Any covenant . . . imposing an unreasonable restraint is illegal, void and unenforceable even as to any part of the covenant or performance that would be a reasonable restraint.

Wis. Stat. § 103.465.

In order for a covenant not to compete to be enforceable under Wisconsin law, it must: (1) be necessary to protect the employer's legitimate interests; (2) provide a reasonable time restriction; (3) provide a reasonable geographical restriction; (4) not be harsh or oppressive to employees; and (5) not be contrary to public policy. Nalco Chem. Co. v. Hydro Techs., Inc., 984 F.2d 801, 805 (7th Cir. 1993) (citing Pollack v. Calimag, 157 Wis. 2d 222 (Wis. Ct. App. 1990)). A customer list limitation can replace a geographical limitation. See Farm Credit Servs. of N. Cent. Wis., ACA v. Wysocki, 243 Wis. 2d 305, 314 (2001).

Based on the foregoing, I find Prudential's covenants not to compete at issue in this case reasonable. The covenants are necessary to protect Prudential's legitimate business interests. In Farmers Insurance, a very similar case decided in this district, the court held that an employer had legitimate business interests in maintaining long-term customer relationships. 99 F. Supp. 2d at 1006-07. The Farmers Insurance court stated:

> The agents benefit from the goodwill and name recognition that Farmers has attained in the community through its advertising, public relations and history of operation. Farmers argues that its goodwill generally translates

9

From: Robert B. Corris 414-272-8050  To: Anthony Paduano                 Date: 3/10/2003 Time: 1:04:06 PM                    Page 12 of 20

03/10/03  13:53 FAX 414 297 1298              JUDGE ADELMAN                                              @ 011

Into long-term customer relationships, so that Farmers has an expectation that its existing policyholders will remain Farmers policyholders into the future. . . . [E]ach Farmers agent cultivates Farmers' goodwill on a personal level and becomes the face of Farmers insurance to the policyholders.  As a result, Farmers is vulnerable to policy conversion when a Farmers agent resigns and begins selling competing insurance products.

Id.  The situation with Prudential is similar in that each Prudential agent is assigned a book of business that they service, which in many instances include clients cultivated by Prudential before the agent began or, even when initially sold by the agent at issue, were cultivated in some good part based on Prudential's goodwill and name recognition.

I find further evidence of reasonableness in that Prudential's covenants not to compete are limited to two years and solely to the employee's former book of business. See, e.g., Lakeside Oil Co. v. Slutsky, 8 Wis. 2d 157, 164-65 (1959) (finding two-year temporal restriction reasonable); Pollack v. Calimag, 157 Wis. 2d 222, 238 (Wis. Ct. App. 1990) ("Two-year restraints generally are considered reasonable in Wisconsin."); Farm Credit Servs., 234 Wis. 2d 305, 314 (finding that a customer list restriction is an acceptable replacement for a geographical restriction).  The only people, businesses or organizations which defendants are restricted from soliciting are their own former clients; the rest of the available universe of potential customers is left open to their solicitation.  This does not appear too harsh or oppressive to defendants in this instance.  In terms of public policy, while Wisconsin has a clear policy toward voiding unreasonable covenants not to compete, there are certainly public benefits from enforcement of contractual agreements when the terms of such agreements are

From: Robert B. Corris 414-272-8050 To: Anthony Paduano          Date: 3/10/2003 Time: 1:04:06 PM                    Page 13 of 20.

03/10/03  13:59 FAX 414 297 1296          JUDGE ADELMAN                    ☑012

reasonable.  See Farmers Ins., 99 F. Supp. 2d at 1008.

Defendants' arguments that the contracts are void are unavailing.  Defendants argue that the various agreements between Prudential and defendants are void for three reasons.  The first two reasons involve the dissection of the various agreements to find unenforceable provisions that would arguably void the agreements in their entirety under Wis. Stat. § 103.465.  The final argument involves an examination of NASD policy.  I will address these arguments in turn.

First, defendants argue that the various agreements contain covenants which prohibit the disclosure of confidential business information and that these provisions are unenforceable because they do not carry temporal or geographic limitations.  Prudential argues that the information they are trying to protect constitute trade secrets, for which there is no need for temporal or geographic limitations.  IDX Sys. Corp. v. Epic Sys. Corp., 165 F. Supp. 2d 812, 820 (W.D. Wis. 2001) ("Confidentiality provisions that protect trade secrets are inherently reasonable and need not include geographic or temporal limitations."), aff'd in pertinent part, 285 F.3d 581 (7th Cir. 2002).  Defendants argue that because these provisions do not specify whether or not the information being protected constitutes a trade secret, temporal and geographic restrictions are necessary pursuant to § 103.465.

Under the Wisconsin Trade Secrets Act, a trade secret is information that:

(i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

11

(ii) is the subject of efforts to maintain its secrecy that are reasonable under the circumstances.

Wis. Stat. § 134.90.

Factors that may be considered in evaluating whether information is a trade secret are:

(1) the extent to which the information is known outside of [the employer's] business; (2) the extent to which it is known by employees and others involved in [the employer's] business; (3) the extent of measures taken by [the employer] to guard the secrecy of the information; (4) the value of the information to [the employer] and to his competitors; (5) the amount of effort or money expended by [the employer] in developing the information; [and] (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

Minuteman, Inc. v. L.D. Alexander, 147 Wis. 2d 842, 851 (1989).

Prudential points to the fact that each of the defendants expressly agreed in their contracts with Prudential that the company's confidential and proprietary business and customer information constitutes trade secrets. These contracts provide that this information is unique, extremely valuable to Prudential, and is developed and acquired by great expenditures of time, effort and cost. These agreements are a concession on defendants' part that what Prudential sought to protect were its trade secrets. Furthermore, based on the above-mentioned Minuteman factors, Prudential has presented sufficient evidence at this preliminary stage of the proceedings that the information it is trying to protect are trade secrets.

Next, defendants argue that the restrictive covenants are unenforceable because the customer restrictions are overbroad. Specifically, defendants point to provisions

in the various contracts that restrict solicitation of former customers and argue that because there is no 'back-dating' of the number of years' worth of customers from which defendants are restricted from soliciting, these provisions are overbroad and void the entire contracts at issue. Defendants rely principally on Equity Enters., Inc. v. Milosch, 247 Wis.2d 172 (Wis. Ct. App. 2001). In Milosch, a Wisconsin Court of Appeals found that a similar provision that restricted solicitation of any former customer, when the employee in question had worked for his former employer for fifteen years, was overbroad and unenforceable. However, it is not at all clear that the Court of Appeals intended to establish a per se rule that all customer list restrictions must be backdated in order to be enforceable. In the present case, defendants, for the most part, worked for Prudential for only a brief span of time -- defendant Jonas for one year and three months, defendant Peter Tourville for two years and four months, defendant Landowski for two years and nine months, defendant Petersen for four years and seven months and defendant Paul Tourville for nine years and five months. In Rollins Burdick Hunter of Wis., Inc. v. Hamilton, 101 Wis. 2d 460, 462-63 (1981), the Wisconsin Supreme Court approved a contract that restricted solicitation of customers backdating to the two years before leaving employment. For defendants Jonas, Landowski, Peter Tourville and even Petersen, the restriction imposed in the present case is much more akin to the situation in Rollins than in Milosch.

Even as regards Paul Tourville, however, the situation is distinguishable from the one found unenforceable in Milosch. Paul Tourville signed a contract restricting his

solicitation of former customers upon leaving employment.  Unlike the employee in

Milosch, whom the court felt the need to protect because he would have been held to

a non-solicitation provision restricting solicitation of any former customer from a

contract that he had signed fifteen years earlier, upon beginning employment, Paul

Tourville was aware at the very end of his employment as to exactly who he was

agreeing not to solicit for the following two years.  Therefore, I do not find defendants'

argument here strong enough to find the contracts unenforceable.

Finally, defendants argue that NASD Interpretive Material 2110-7 invalidates the

restrictive covenants not to compete at issue in this case.  I disagree.  NASD

Interpretive Material 2110-7 provides in relevant part:

> It shall be inconsistent with just and equitable principles of trade for a
> member or person associated with a member to interfere with a
> customer's request to transfer his or her account in connection with the
> change in employment of the customer's registered representative ...
> Prohibited interference includes, but is not limited to, seeking a judicial
> order or decree that would bar or restrict the submission, delivery, or
> acceptance of a written request from a customer to transfer his or her
> account.

However, NASD Regulation's statement of purpose of the proposed rule change makes

clear that plaintiff is not precluded from seeking equitable relief.

> NASD Regulation represents that the proposed rule change does not affect
> the ability of member firms to use employment agreements to prevent
> former representatives from soliciting firm customers. Similarly, NASD
> Regulation believes that the proposal would not prevent a firm from
> enforcing employment agreements with former representatives. For
> example, NASD Regulation represents that a member could seek an
> injunction against a former registered representative and/or his or her new
> firm to prohibit solicitation of the member's customers if the registered
> representative had signed an employment contract agreeing not to solicit

From: Robert B. Corris 414-272-8050 To: Anthony Paduano          Date: 3/10/2003 Time: 1:04:06 PM          Page 17 of 20

05/10/03  14:00 FAX 414 297 1296      JUDGE ADELMAN                                   ☑016

those customers. Rather, NASD Regulation represents that the proposed rule change is limited to restricting a member from interfering with a customer's right to transfer his or her account in the context of an employment dispute, once the customer has requested the transfer.

NASD Adopting Release, 67 Fed. Reg. 1790, 1791 n.4 (Jan. 14, 2002). The statement of purpose expressly states that the rule is not intended to prevent a firm from enforcing employment agreements with former representatives.

2.      Enforceability of Covenants Prohibiting Solicitation of Former Co-Workers

Likewise, I find that Prudential's covenants prohibiting solicitation of former co-workers for a two-year period after termination are enforceable. There is precedent for courts issuing injunctions specifically enforcing such covenants. See Smith, Barney, Harris Upham & Co. v. Robinson, 12 F.3d 515, 517-18 (5th Cir. 1994) (affirming district court's decision to enforce agreement restricting defendant from soliciting former co-workers, noting that defendant was still free to recruit "anywhere, any time, and from any organization -- save only that small class comprising [his former employer's] employees, a class which he willingly agreed not to solicit"); Frederick Chusid & Co. v. Marshall Leeman & Co., 326 F. Supp. 1043, 1061 (S.D.N.Y. 1971) (issuing an injunction upon finding defendants breached their duty of loyalty by soliciting former co-workers even absent an agreement not to so); Wear-Ever Aluminum, Inc. v. Townecraft Indus., 75 N.J. Super. 135, 148 (N.J. Super. Ct. Ch. Div. 1962) (granting permanent injunction on recruitment of former co-workers even absent a restrictive covenant). Furthermore, defendants do not squarely address the enforceability of the covenants prohibiting solicitation of former co-workers, other than

15

to try to void the various agreements in their entirety pursuant to Wis. Stat. § 103.465 because of alleged flaws in other provisions.

## C. Other Considerations with Respect to Grant of TRO

I have already found that Prudential has a reasonable likelihood of success on the merits on their restrictive covenant claims. However, even if Prudential's likelihood of success on the merits were not entirely airtight, the degree to which the other factors regarding the preliminary injunction analysis weigh in Prudential's favor further bolster its request for injunctive relief. For the purposes of a preliminary injunction, a plaintiff in the Seventh Circuit need only show a modest chance of prevailing on the merits if the balance of harms weighs strongly in plaintiff's favor. Green River Bottling Co. v. Green River Corp., 997 F.2d 359, 361 (7th Cir. 1993) ("Even if [the moving party] had only a modest chance of prevailing on the merits, it would be entitled to a preliminary injunction if it could show that the denial of the injunction would inflict severe irreparable harm on it while the grant of the injunction would inflict little or no harm on the [opposing party]."). I find that Prudential makes a strong showing on the remaining factors for obtaining a preliminary injunction.

In terms of whether there is an adequate remedy at law and whether Prudential will suffer irreparable harm without the injunction, Prudential wins on both. Monetary damages calculated after the fact cannot fully compensate Prudential for the loss of its customers due to improper solicitation – it is difficult to put a price on this lost business and the more desirable remedy is understandably to prevent such loss initially rather

than to try to put a money figure to it after the fact.  The harm done to Prudential in the meantime is irreparable.  See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Salvano, 999 F.2d 211, 215 (7th Cir. 1993) (finding that evidence showing that former Merrill Lynch employees took client information and solicited former clients "sufficiently supports the [lower] court's determinations regarding irreparable harm and the inadequacy of Merrill Lynch's legal remedy"); see also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley, 756 F.2d 1048, 1055 (4th Cir. 1985) ("Merrill Lynch faced irreparable, noncompensable harm in the loss of its customers").

The balance of the harms also falls strongly in plaintiffs' favor.  In this instance, a preliminary injunction merely maintains the status quo without prejudice to the merits of the parties' claims until the NASD arbitration panel can consider the issues presented.  See Merrill Lynch, 999 F.2d at 215.  Granting a preliminary injunction in this instance triggers an expedited review of the case on its merits by the NASD arbitration panel.  Maintenance of the status quo until this expedited review is surely a minimal harm to defendants, compared to the irreparable harm Prudential faces in the absence of injunctive relief.  Finally, as I have already determined that the restrictive covenants do not contravene public policy, I find that the grant of an injunction enforcing them does no harm to the public interest.[2]

---

[2] I need not address Prudential's third claim regarding trade secrets because the relief requested under the trade secrets claim is the same as the relief requested under the covenant not to compete claim — namely, a preliminary injunction enjoining defendants from further solicitation of their former Prudential customers.  I have already granted this relief based on the earlier

17

## V. CONCLUSION

THEREFORE, IT IS ORDERED that plaintiffs' motion for a preliminary injunction is GRANTED.  Defendants are enjoined from soliciting both former customers and former co-workers until such time as the NASD arbitration panel has opportunity to decide the dispute on its merits.

Dated at Milwaukee, Wisconsin this ____ day of March, 2003.

LYNN ADELMAN
District Judge

claim.